No. 23-2295

In The

# United States Court of Appeals for the Fourth Circuit

Group Home on Gibson Island, LLC and
Assisted Living Well Compassionate Care 2, LLC

*Appellants*

v.

Gibson Island Corporation

*Appellee*

On Appeal from the United States District
Court for the District of Maryland,
No. 1:20-cv-00891-LKG

## Brief of Appellants (Page-Proof)

Steven M. Klepper
Geoffrey H. Genth
Justin A. Redd
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030
sklepper@kg-law.com
ggenth@kg-law.com
jredd@kg-law.com

Matthew D. Skipper
Jeffrey A. Kahntroff
SKIPPER LAW, LLC
2127 Espey Court, Suite 100
Crofton, Maryland 21114
(410) 919-2121
matt@skipperlawllc.com
jeff@skipperlawllc.com

*Counsel for Appellants Group Home on Gibson Island, LLC
and Assisted Living Well Compassionate Care 2, LLC*

## Disclosure Statement

Pursuant to FRAP 26.1 and Local Rule 26.1, <u>Group Home on Gibson Island, LLC and Assisted Living Well Compassionate Care 2, LLC</u>, who are <u>Appellants</u>, make the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity? **NO**

2. Does party/amicus have any parent corporations? **NO**

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? **NO**

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? **NO**

5. Is party a trade association? (amici curiae do not complete this question)? **NO**

6. Does this case arise out of a bankruptcy proceeding? **NO**

7. Is this a criminal case in which there was an organizational victim? **NO**

Dated: March 19, 2024

*/s/ Steven M. Klepper*
*Counsel for Group Home on Gibson Island, LLC and Assisted Living Well Compassionate Care 2, LLC*

4862-2724-6502, v. 3.1

# Table of Contents

Disclosure Statement ...................................................................... ii

Table of Contents ......................................................................... iii

Table of Authorities.................................................................... v

Jurisdictional Statement ............................................................ 1

Issues Presented......................................................................... 1

Statement of the Case................................................................ 1

    A.   Gibson Island is a gated community with a history of discrimination, and with no group homes. .................................. 3

    B.   2016-2019: The Lussis' efforts to establish a group home met overt hostility and bias. ............................................................... 5

    C.   Early 2020: The Lussis bought Banbury House, drawing calls to "identify all legitimate, legal strategies available to us to thwart [governmental] approvals." ............................................... 9

    D.   Spring 2020: Litigation began, as the Corporation devised a strategy "to defend deeds and agreements v[ersus] FHA." .......... 11

    E.   May 28, 2020: The district court required a formal accommodation request that the Corporation could "fully, fairly, and promptly consider." .................................................... 14

    F.   June 4, 2020: The County confirmed the septic system's adequacy, rebuffing the Corporation's campaign to revoke the permit. ........................................................................................ 15

    G.   June 10, 2020: The Lussi LLCs requested an accommodation, as President Daly told the new Accommodations Committee Mr. Lussi was a "burden." ............................................................ 17

    H.   July to Dec. 2020: The Accommodations Committee slow-walked the response, taking six months to make a recommendation. ....................................................................... 18

    I.   Jan. to Apr. 2021: The Corporation scuttled a resolution denying the accommodation, instead proposing 23 conditions on approval.................................................................................. 20

    J.   Apr. 2021: The Corporation unilaterally abandoned the interactive process, never to return............................................. 24

4862-2724-6502, v. 3.1

K.  Mar. 2022: When the Lussi LLCs sent a revised draft MOU, with minimal revisions to the Corporation's March 2021 draft, the Corporation refused to negotiate. ......................... 25

L.  June to Sept. 2022: The Corporation removed compacted gravel portions of Banbury Road and made statements fueling escalating harassment. ............................................. 27

M.  Nov. 2022: The DOJ disagreed with the Corporation's "cramped and narrow analysis." ................................. 29

N.  Nov. 2023: The district court granted summary judgment, barely acknowledging the DOJ's submission. ............................ 30

Summary of Argument ................................................................ 30

Standard of Review ................................................................... 31

Argument ................................................................................. 31

I.   The Corporation illegally denied a reasonable accommodation. ........ 31

A.  Fair housing laws protect efforts to establish for-profit group homes in the face of disability discrimination. ......................... 31

B.  Gibson Island's first-ever group home is a reasonable and necessary accommodation for persons with disabilities. ............ 36

1.  Federal Law ................................................................. 36

2.  Maryland Law ............................................................. 46

C.  The Lussi LLCs are entitled to summary judgment or a jury trial on their claim for declaratory relief. .................................... 48

II.  The Corporation engaged in unlawful discrimination and retaliation. ........................................................................ 50

Conclusion ............................................................................... 62

Statement Respecting Oral Argument ......................................... 63

Certificate of Compliance ......................................................... 64

Certificate of Service ................................................... unnumbered

iv

# Table of Authorities

## Cases

*A Helping Hand, LLC v. Baltimore Cnty.*,
  515 F.3d 356 (4th Cir. 2008) .................................................... 40, 55, 60

*Alboniga v. Sch. Bd. of Broward Cnty.*,
  87 F. Supp. 3d 1319 (S.D. Fla. 2015) ........................................ 42

*Aleman v. City of Charlotte*, 80 F.4th 264 (4th Cir. 2023) .................. 31, 48

*Bd. of Dirs. of Cameron Grove Condo., II v. State Comm'n
  on Hum. Rels.*, 63 A.3d 1064 (Md. 2013) .........................................46-49

*Bryant Woods Inn, Inc. v. Howard Cnty.*,
  911 F. Supp. 918 (D. Md. 1996) ............................................... 53

*Bryant Woods Inn v. Howard Cnty.*,
  124 F.3d 597 (4th Cir. 1997) .............................................33-34, 37-39, 47

*Cmty. Hous. Tr. v. Dep't of Consumer & Regul. Affs.*,
  257 F. Supp. 2d 208 (D.D.C. 2003) ......................................... 37

*Commodities Rsrv. Corp. v. M/S Roumania*,
  806 F.2d 501 (4th Cir. 1986) ................................................ 47

*Dr. Gertrude A. Barber Ctr. v. Peters Twp.*,
  273 F. Supp. 2d 643 (W.D. Pa. 2003) ....................................... 35

*Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243 (4th Cir. 2015) .................. 59

*Gentry v. E.W. Partners Club Mgmt. Co.*,
  816 F.3d 228 (4th Cir. 2016) ................................................ 52

*Groome Res. v. Parish of Jefferson*,
  234 F.3d 192 (5th Cir. 2000) ..............................................32-37

*Laing v. Fed. Exp. Corp.*, 703 F.3d 713 (4th Cir. 2013) ........................... 53

*Oconomowoc Residential Servs. v. City of Milwaukee*,
  300 F.3d 775 (7th Cir. 2002) ...........................................31, 34, 49

*Pac. Shores Properties, LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) .............................................. 53

*Parris v. Pappas*, 844 F. Supp. 2d 271 (D. Conn. 2012) ........................... 42

*Pinchback v. Armistead Homes Corp.*,
  907 F.2d 1447 (4th Cir. 1990) .............................................. 53

*Potomac Grp. Home Corp. v. Montgomery Cnty.*,
  823 F. Supp. 1285 (D. Md. 1993) ........................................... 37

*Reyes v. Waples Mobile Home Park L.P.*,
   903 F.3d 415 (4th Cir. 2018) ....................................................51

*Romeka v. RadAmerica II, LLC*, 301 A.3d 26 (Md. 2023) ........................ 52

*Ruffin Hotel Corp. of Md. v. Gasper*, 17 A.3d 676 (Md. 2011) ............. 52, 58

*Schwarz v. City of Treasure Isl.*, 544 F.3d 1201 (11th Cir. 2008)............... 35

*Scoggins v. Lee's Crossing Homeowners Ass'n*,
   718 F.3d 262 (4th Cir. 2013)............................................................34-35

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*,
   938 F.3d 1259 (11th Cir. 2019)................................................................. 35

*Smith & Lee Assocs., Inc. v. City of Taylor*,
   13 F.3d 920 (6th Cir. 1993)..................................................................... 39

*United States v. Cal. Mobile Home Park Mgmt. Co.*,
   29 F.3d 1413 (9th Cir. 1994) ................................................................. 42

*United States v. Savannah Pines*,
   No. 4:01-cv-03303 (D. Neb. Nov. 29, 2001)........................................ 42

*United States v. Twining Serv. Corp.*,
   No. 2:05-cv-05177 (E.D. Pa. Sept. 30, 2005) ...................................... 42

*US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)................................34-35

*Valencia v. City of Springfield*, 883 F.3d 959 (7th Cir. 2018) ................... 33

*United States v. Yonkers Bd. of Educ.*,
   837 F.2d 1181 (2d Cir. 1987) ................................................................ 55

*Vorchheimer v. Philadelphian Owners Ass'n*,
   903 F.3d 100 (3d Cir. 2018) ................................................................. 35

*Walker v. Todd Vill., LLC*, 419 F. Supp. 2d 743 (D. Md. 2006)................. 53

*Walton v. Mental Health Ass'n*, 168 F.3d 661 (3d Cir. 1999)..................... 49

*Wis. Cmty. Servs. v. City of Milwaukee*,
   465 F.3d 737 (7th Cir. 2006) ................................................................ 33

## Statutes and Rules

28 U.S.C. § 517.............................................................................. 29, 43

28 U.S.C. § 1291....................................................................................1

28 U.S.C. § 1367....................................................................................1

42 U.S.C. § 3601 ................................................................................. 32

42 U.S.C. § 3602....................................................................................51

4862-2724-6502, v. 3.1

42 U.S.C. § 3604.................................................32, 43, 51,

42 U.S.C. § 3613 .................................................. 1, 51

42 U.S.C. § 3617.................................................51

Md. Code, State Gov't § 20-702.................................... 47

Md. Code, State Gov't § 20-706........................................ 46, 52

Md. Code, State Gov't § 20-708 ............................................ 52

## Other Authorities

H.R. Rep. No. 100-711 (1988)...................................................... 33

HUD-DOJ Joint Statement, *Reasonable Accommodations Under the Fair Housing Act* (2004)........................................................ 42

HUD-DOJ Joint Statement, *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act* (2016).............. 55

4862-2724-6502, v. 3.1

## Jurisdictional Statement

The district court had jurisdiction over Fair Housing Act ("FHA") claims brought by Appellants ("Lussi LLCs") under 42 U.S.C. § 3613, and supplemental jurisdiction over their related state-law claims under 28 U.S.C. § 1367. JA|#47|. The district court entered judgment for the Corporation on November 16, 2023. JA|#111|. The Lussi LLCs appealed 29 days later. JA|#112|. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

1.     Was the Corporation obligated under the FHA or Maryland law to grant the Lussi LLCs' accommodation requests?

2.     Did the district court err in granting summary judgment on the Lussi LLCs' discrimination and retaliation claims?

## Statement of the Case

The Lussi LLCs were formed to open Gibson Island's first-ever group home for persons with disabilities. Appellee Gibson Island Corporation ("Corporation") is the affluent neighborhood's homeowners association.

Before delving into the parties' conflict, we begin with the words of Miles J. Varn, M.D., a former Corporation Board member and past president of the Gibson Island Club:

> Gibson Island needs a place for its residents to age, without having to go back to Baltimore or Washington. I have helped Gibson Island residents die at home. While I cannot disclose

specific medical or other identifying information, I have seen others have to move away because they could not take care of themselves sufficiently to remain in their homes, either with a spouse or alone, and because a group home setting was not available on Gibson Island. Banbury House will provide a much needed option for residents of Gibson Island as they age.

JA|PX4¶5|.

In an idyllic setting, it is natural to view the status quo through rose-colored lenses. The Corporation's president agreed with a resident that "[o]ur long term elderly move elsewhere, if necessary; they understand and want to preserve the nature of this community." JA|PX14p230-231, PX24p28|. Seniors with disabilities leave Gibson Island because they have no options. "Reasonable accommodations" create such options.

It is also human nature to circle the wagons against anyone who might disturb the idyllic status quo. The Corporation's thesis is that Craig Lussi is an undue burden. That argument turns on an incorrect legal premise and, in any event, overlooks the many acts the Corporation has taken, tolerated, or stoked to escalate the dispute. Powerful shareholders oppose any group home, and emails document how the Corporation responded with a legal strategy designed to thwart the group home at any cost. We address the evidence of the Corporation's unlawful motive because it is legally relevant. We also give context for the Corporation's Lussi-as-burden arguments.

## A. Gibson Island is a gated community with a history of discrimination, and with no group homes.

Gibson Island is an affluent gated neighborhood in Anne Arundel County ("County") on the Chesapeake Bay. JA|PX2¶4, PX11p29-30|. It has around 200 homes, multiple businesses, a hotel, and hundreds of non-resident employees. JA|PX2¶4|.

The Corporation serves as the HOA. JA|PX2¶4, PX11p65|. Its shareholders are the residential property-owners. JA|PX2¶4|.

Gibson Island Club is a private country and yacht club. JA|PX2¶5|. The The Board and Club have interlocking boards of directors and share resources and employees, including the Island Manager, to whom Gibson Island's private police force reports. JA|PX2¶5, PX14p84-85|. These "complementary organizations" "work together to ensure that" Gibson Island "will continue to retain and attract Residents and Club members of high quality who share in our vision." JA|PX2¶5, PX12|. Their shared website says the Gibson Island "enterprise" was established a century ago "as a purely social club, in which membership [could] be had only by invitation," and "continues to maintain an image of wealth and sophistication." JA|PX17p5|. Gibson Island has one of the nation's wealthiest zip codes. JA|PX2¶4|.

Gibson Island has a profound lack of diversity, including as to race, disability, economic status, and sexual orientation, JA|PX2¶4, PX16p81-

82,86-89|, with a reputation for being what one Board member describes as "a White Anglo-Saxon Protestant preserve." JA|PX9p61-62|; *see also* JA|PX17p6, PX18¶13|. The Club has around 1,000 member families, including almost all Gibson Island residents, plus hundreds of non-residents. JA|PX11p27-28, PX13p230|. Only one Club member is African-American. JA|PX13p230|. The Corporation only superficially investigated racially motivated misconduct by its police force. JA|PX19p15-17, 57-70|.

Advancing the goal of attracting and retaining "high quality" residents, JA|PX12|, the Corporation's in-house real-estate division brokers many transactions. JA|PX2¶7|. The division's office, like all Corporation facilities, is not readily wheelchair accessible. JA|PX2¶6-7|.

Under a 1925 restrictive covenant, buildings "may be erected, maintained or used for business purposes in such locations as may be approved by the [Corporation], provided, however, that no building shall be erected, maintained, or used for any of the said purposes" without the Company's approval. JA|DX1p7|.

No assisted living group home for individuals with disabilities, or any other congregate-living setting, has ever operated on Gibson Island. JA|PX2¶7|. In 1991, the Corporation and Club agreed, as part of a court-recorded settlement of a discrimination lawsuit, *Carson v. Cecil*, to enter into

leases forbidding the Club from discriminating against any individual on the basis of disability or other protected characteristic. JA|PX2¶5, #71-69p78-94|. Disability discrimination has, however, continued. JA|PX2¶ 6|.

## B. 2016-2019: The Lussis' efforts to establish a group home met overt hostility and bias.

The Lussis are longtime Gibson Island homeowners. JA|PX1¶8|. Since 2007, they have operated three group homes for seniors with disabilities in the County. JA|PX1¶¶1-3|. Their group homes are known for excellent care, and have functioned without significant issues vis-à-vis the surrounding neighborhoods. JA|PX2¶2, PX3-PX8, PX35|.

The Lussis see this work as a calling. JA|PX2¶2|. Ms. Lussi cares for residents and supervises the staff and day-to-day operations. JA|PX 1¶1|. Mr. Lussi handles the homes' business affairs. JA|PX2¶2|.

In 2016, the Lussis began unsuccessful efforts to establish a group home for seniors with disabilities on Gibson Island. JA|PX2¶15|. In May 2016, Mr. Lussi proposed to Gregory Cross, Esquire—then the Corporation's president—that the Lussis' rental property at 638 Paisley Road become an assisted-living group home. JA|PX2¶16|. Although the Corporation had made commissions from the property's rental use, Mr. Cross drew the line at assisted living: "No. An assisted living is a non-starter." JA|PX2¶17|. Mr. Lussi offered a compromise, limiting residency to "family and friends" of

Gibson Island residents or Club members. JA|PX2¶17|. Mr. Cross responded: "No, we do not want that on Gibson Island." JA|PX2¶17|.

In August 2016, Mr. Lussi sought to buy a lot at 430 Magothy Road, which the Corporation owned and advertised for sale. JA|PX2¶18|. His proposal included various alternatives for a group home. JA|PX20p3-6|. The Corporation's treasurer Jeffrey Kanne, Esquire responded: "Regarding assisted living, before we spend the time sorting through the feasibility of your proposal, we need to answer the threshold question of whether the Island Community would support the concept." JA|PX20p2|. He said that the Corporation had "a board meeting next week and I will suggest to Greg [Cross] that we discuss the concept then and see whether it would be supported." JA|PX20p2|. Eight days later, Mr. Kanne informed Mr. Lussi that "there is no interest in the assisted living concept." JA|PX20p2, PX11p125-27|.

The community's aversion to "the assisted living concept" extended to group homes *near* Gibson Island. In 2018, Lussis received a permit for a proposed group home on Mountain Road in Pasadena, 1.1 miles away. JA|PX2¶19|. That property neighbors a 27-acre farm owned by Club members Stephen Waltjen and Gregory Waltjen. JA|PX2¶19|. The Waltjen brothers publicly expressed discriminatory opposition, including statements

about a "dump field" and "dirty old people's diapers," and a threat "to put hogs in" so that "the old people can smell [pigs] along with the diapers." JA|PX21p2|.

The Mountain Road group home was widely discussed, with many Gibson Islanders (including the Corporation's leaders) opposing it. JA|PX14p15-27|. The Lussis faced personal attacks and threats during this time. JA|PX2¶22-23|.

A group of Gibson islanders lobbied the Corporation and the Club to oppose the Mountain Road group home, and to sanction Mr. Lussi. JA|PX14p102-125|. Corporation President James Daly received emails from residents that the Mountain Road group home "would alter the very peaceful bucolic nature of that area," and that "the island should take a position on this if it has not already." JA|PX24p2|. The Corporation and Club obliged these lobbying efforts. JA|PX24p2-17|. President Daly solicited complaint letters from group-home opponents. JA|PX14p97, 135-139, 143-146|. He used these letters to orchestrate Corporation and Club sanctions against Mr. Lussi, without notifying him or seeking his side. JA|PX24p2-17, PX14p123-124|. President Daly "did not wish to talk with [Mr. Lussi] about" the impending Corporation and Club actions. JA|PX14p131-133, 149-152|.

4862-2724-6502, v. 3.1

The Corporation publicly condemned Mr. Lussi, and the Club expelled him, in November 2019. JA|PX25-PX 26|. He was the first shareholder ever subjected to such actions. JA|PX10p150-152|. Those actions were based on false assertions. JA|PX2¶25, PX14p143-145|. A "Dear Shareholder" letter broadcast these falsehoods. JA|PX2¶25, PX27|.

In December 2019, Mr. Lussi again tried buying 430 Magothy Road, making a standard-form, full-price offer. JA|PX2¶26, PX28|. The Corporation's in-house Realtor Sarah Kanne, Esquire (Mr. Kanne's spouse) was at first receptive. JA|PX29|. As in 2016, the Corporation soured upon learning of Mr. Lussi's intent to start a group home. JA|PX2¶26, PX16p125-129|. At the December 2019 shareholders' meeting, board member (and Club president) Henry Hagan falsely stated that the Corporation had received a second full-price offer on 430 Magothy Road. JA|PX2¶26, PX16p150-152|. President Daly was on a December 2019 email exchange asking to "please forward [to President Daly] all my communication[s] you deem helpful to Gibson Island and our goal of stopping this commercial endeavor in our neighbor[hood]." JA|PX24p10-11|.

Although the Corporation secured no competing offers, it still rejected Mr. Lussi's full-price offer in January 2020. JA|PX30|. Ms. Kanne consulted a lawyer and recommended that President Daly *not* explain the

Corporation's reasons, because "if the Corporation were to provide the reasons the offer is subpar, it is quite likely Lussi could amend his offer to address those concerns." JA|PX31p3|.

President Daly's letter stated that the "Executive Committee rejects your Offer, finding its terms inadequate," without identifying any inadequacy, while insisting the rejection "has nothing to do with the prospective use of the Magothy Road property." JA|PX30p1, 4|.

### C. Early 2020: The Lussis bought Banbury House, drawing calls to "identify all legitimate, legal strategies available to us to thwart [governmental] approvals."

Undaunted, the Lussis bought another Gibson Island property, Banbury House. JA|PXp2¶27|. The sellers supported the Lussis' effort to open a group home in the face of the Gibson Island's "deep and dark rooted history of discriminating." JA|PX32p95-96|. The sellers had applied for a permit to convert Banbury House into a group home in November 2019. JA|DX15|. The County issued a permit for a nine-bed group home in January 2020. JA|DX21|.

The Lussi LLCs closed the sale in March 2020, after (a) the Lussis' fair housing counsel issued opinion letters to the lender that any attempt by the Corporation to enforce business-purpose restrictions against a group home "would be unsuccessful"; and (b) the Corporation confirmed its 2004 non-discrimination policy on the enforcement of such restrictions. JA|PX2¶28,

PX33p2-4|. Work began on March 4, the same day as closing. JA|#71-20¶19|.

Banbury House stands across from the home of Henry Hopkins, Esquire—a lifetime Gibson Islander who served as T. Rowe Price's general counsel for 30 years and wields considerable influence. JA|PX2¶29, PX14p194-197, 308-309, PX34p13-31|. He emailed President Daly and Ms. Kanne on March 25 when he learned the Lussis planned "a retirement group home," stating that "I cannot express more forcefully my distress over being blindsided by this development if this is true." JA|PX24p18|. An hour later, Mr. Kanne emailed President Daly:

> [We] should identify all legitimate, legal strategies available to us to thwart Lussi's [governmental] approvals and get prepared to advance our strategies at the appropriate time ....
>
> We need to be prepared to fight until the end and you should get the community ready for the fight. I think a vote of the community might be helpful to show that not only does [the Corporation], acting through its board, have a legal and legitimate interest in the matter, the community overwhelming[ly] opposes the change.

JA|PX24p20|.

That day, the Corporation emailed a cease-and-desist letter. JA|DX26|. Mr. Daly followed up with a March 26 letter: "The Corporation is certainly willing to consider any proposal you care to make for an exemption from the Deeds and Agreement, and to engage in a fully cooperative dialogue

with you about it." JA|DX25|. Only later would discovery show the truth: this letter was part of a plan to "fight to the end" to "thwart Lussi's [governmental] approvals." JA|PX24p20|; *see* JA|PX24p31|.

There was no Court order in place, and the two sides differed on the effect of the business-purpose restriction. Mr. Lussi consulted County Police, State Police, the FBI, and fair housing counsel. JA|PX2¶30|. On March 26, the Corporation's private police directed the Lussi LLCs' contractors to leave Gibson Island. JA|DX2p7|. When the Corporation blocked the contractors' vehicles at the gatehouse, Mr. Lussi drove them in his own vehicle. *Id.* When the Corporation refused to let Mr. Lussi enter his neighborhood with the contractors, he began ferrying them by boat and continued exterior work. *Id.* State Police told President Daly and the Island's police chief, in Mr. Lussi's presence, that they were violating Mr. Lussi's and his invitees' civil rights blocking access to the neighborhood. *Id.*

### D. Spring 2020: Litigation began, as the Corporation devised a strategy "to defend deeds and agreements v[ersus] FHA."

On March 31, the Corporation sued for a declaratory judgment that the Lussi LLCs could not proceed without applying to the Corporation for an exception from the business-purpose restriction and participating in an interactive process. JA|DX2p1|. The Lussi LLCs filed this separate lawsuit four days later, and the district court consolidated the cases. JA|#13|.

4862-2724-6502, v. 3.1

Even as the Corporation publicly expressed willingness to engage in the interactive process, and denied any discriminatory intent, many Gibson Islanders, including Mr. Hopkins, expressed discriminatory views about group homes and encouraged aggressive action to prevent the group home from opening. JA|PX14p56-60, 198-200, 222, 230-31, 343-47, PX24p18-81|. A resident told President Daly that Lussi's "selfish, commercial interests ... will unleash a whirlwind of anger." JA|PX24p27|

Rather than stand up against shareholders' discriminatory views, President Daly pledged: "We'll do our best to defend deeds and agreements v[ersus] FHA." JA|PX24p21|.

Shareholders identified the septic system and other permitting issues as a way to thwart the "inappropriate" use of Banbury House as a group home. JA|PX24p25|. James Baker IV, Esquire suggested to President Daly:

> **Assuming we are in agreement that this activity is inappropriate for this location**, I have several ideas that I think we should actively and expeditiously pursue in terms of limitations on signage, parking, lighting, limiting in the aggregate daily island access for services, and imposition of assessments, as well as more external activity in terms of **seeking injunctive relief pending approvals of septic expansion**, licensing of the commercial activity in question, pursuit of zoning changes (if required), and other activity.

JA|PX24p25| (emphasis added). President Daly's only pushback was on creating a paper trail. He asked that further discussions be "on the phone,"

and stressed that he would "welcome [Mr. Baker's] input as would our litigation steering committee." *Id.*

Corporation board members and Club members expressed to President Daly their distaste for group-home residents using Club facilities. JA|PX14p282-286, PX24p21, 49, 68, 70|. Mr. Hopkins repeatedly expressed that group-home residents should not be welcome to visit the Club or to access Gibson Island's other amenities. JA|PX24p70, PX34p315-319|.

President Daly told a group-home opponent in an April 10 email that "septic" was part of the Corporation's legal strategy to block disability rights under the FHA:

> While it's appropriate for the Corp to file suit, we are taking **a 360 degree look at how to block [Craig Lussi], even if the group home is 'by right' consistent with FHA**.
>
> Our lawyers and I believe the **most effective course** may be the path we're on with state and local regulations, critical areas, parking, **septic**, violations at his other [assisted living] facilities, etc.

JA|PX24p31| (emphasis added). The Corporation soon realized it would get nowhere searching for violations at the Lussis' other group homes, because of "testimonials attesting how great [the Lussis'] places are going back several years now." JA|PX35|.

Following through on President Daly's plan to "block [Craig Lussi], even if the group home is 'by right' consistent with FHA,'" JA|PX24p31|, the

Corporation in late April wrote County officials, repeatedly demanding they revoke the building permit and issue a stop-work order. JA|PX55|. As to the septic system, the Corporation argued that a covenant limited the house to five bedrooms. JA|PX55p2-4|.

A May 1 email to Mr. Hopkins, exploring ways to block the group home, referred to prospective residents as "undesirables." JA|PX36|.

A week later, the Corporation began plans to install a 20-foot netting barrier on the Corporation's golf course that would substantially block the Chesapeake Bay view and common area access that were key attractions for potential residents. JA|PX24p37|. Board member Kevin Reed said it was "[t]oo bad [the barrier] isn't available in pink and orange stripes." *Id*. A future Board member wrote that the barrier "[s]hould really add to his residents' view of the Bay. Middle finger to you, Lussi!" JA|PX37|.

### E. May 28, 2020: The district court required a formal accommodation request that the Corporation could "fully, fairly, and promptly consider."

In late May, the district court ordered that if the Lussi LLCs "wish to establish an assisted living facility" on Banbury Road, they had to:

1. Cease and desist from unilaterally proceeding with development of the facility;

2. Submit a proposal for the facility to [the Corporation] for approval for a business use and exterior improvements; and

3. Explain their plans in the proposal so that [the Corporation]
   may understand them and fully, fairly, and promptly consider
   them[.]

JA|#104-5p5-6|. Denying the Lussi LLCs' claim that it was discriminatory

for the Corporation to enforce the restriction pending an interactive process,

the district court found that Mr. Kanne's 2016 comments about Magothy

Road "were too attenuated to support an intentional discrimination claim

absent additional evidence," and that the Lussi LLCs had not offered

evidence that the Corporation's 2019 rejection of his Magothy Road proposal

was pretextual. JA|DX2p15|. The discrimination claim was "simply unripe at

this stage" until the Lussi LLCs had applied for an accommodation and the

Corporation denied it, "absent any evidence that the Covenants have been

applied to [the Lussi LLCs] with a discriminatory motive." JA|DX2p18|. It

deconsolidated the Lussi LLCs's lawsuit from the Corporation's lawsuit.

JA|#17|.

## F. June 4, 2020: The County confirmed the septic system's adequacy, rebuffing the Corporation's campaign to revoke the permit.

One week after the declaratory judgment, the County rejected a major

part of the Corporation's 360-degree strategy to block the group home.

County personnel inspected the site in response to the County's effort to

thwart government approvals. JA|PX53¶7, PX56p2-3, PX57|.

15

The County, in a June 4 letter from its Department of Inspections and Permits, rejected the Corporation's challenges and found "no basis on which to revoke the building permit." JA|PX58p1|. It pointed out that the complained-of lot coverage had been in place for over 6 years without any prior issue raised until residents learned of the plan to open as a group home. *Id.* As to the septic condition:

> Your letters have been reviewed by the Health Department as well and that Department has **found no reason to withdraw their approval on the building permit.** The Health Department reviewed the permit and gave their approval before it was issued. It is correct that the Nonconventional Agreement authorized the construction of a house over 3,500 square feet, and no more than five bedrooms (at the time of entry into the agreement), but it **does not necessarily restrict the home to five bedrooms**. The agreement indicates that future requests to increase the living space can only be considered where the initial sewage disposal system and future replacement areas are not impacted and where the living space requirements have not been exceeded. **The Health Department has verified that the system is adequate for the proposed renovations.** The original system was approved for a house of over 3,500 square feet, which is capable of handling 900 gallons per day. As a 9 bed group home/assisted living facility, the required flows are 100 gpd per bed, or 900 gpd. **Therefore, the system is adequate for a 9 bed assisted living facility and the Health Department has also verified that the septic system and drain fields are adequate for a 9 bedroom dwelling.** As far as the setback issue, the Health Department typically grants variances of up to 10 feet for reserve areas, so there are no setback issues that would warrant permit revocation.

4862-2724-6502, v. 3.1

JA|PX58p2| (emphasis added).

Also during this time, President Daly's spouse, members of the Corporation's leadership, and other influential Gibson Islanders unsuccessfully lobbied the County Council to adopt group-home limits. JA|PX2¶32|. Mr. Hopkins spearheaded those efforts, telling legislators that "community based group homes ... pose serious health issue[s] to the elderly and environmental issues to the Chesapeake Bay when situated in critical areas." JA|PX24p72, PX34p74-82|. He admittedly lacked a factual basis for those talking points. JA|PX34p168-72, 237-40, 346-52, 355-57|. Group-home opponents coordinated communications with President Daly, Club President Hagan, and Mr. Hopkins. JA|PX14p292-94, PX24p57-61|.

### G. June 10, 2020: The Lussi LLCs requested an accommodation, as President Daly told the new Accommodations Committee Mr. Lussi was a "burden."

On June 10, the Lussi LLCs, through counsel, submitted a formal request for a reasonable accommodation: an exception to the business-purpose covenant. JA|PX38|. The request demonstrated: that the Lussis have a record of success, without controversy, operating group homes in the County; approving Banbury House is reasonable and necessary for seniors with disabilities to live in a group setting enjoying Gibson Island's unique and beautiful waterfront; and that the group home would impose no undue financial and administrative burden or fundamentally alter the

17

neighborhood, which includes eight businesses and a hotel. JA|PX38|. Several witnesses confirmed those facts. JA|PX3-PX 8|.

In late June, the Corporation established an Accommodations Committee comprising David Weinberg, Esquire, future Corporation President Guy Cecala, and Patricia Cecil. JA|#71-36|.

President Daly "suspect[s] that [he] did" suggest to the Accommodations Committee that approval would unduly burden the Corporation. JA|PX14p247-48|. He told the Accommodations Committee that one possible way to impede the group home was for the Corporation to assert that Mr. Lussi *himself* posed an undue burden. JA|PX14p273-75|.

## H. July to Dec. 2020: The Accommodations Committee slow-walked the response, taking six months to make a recommendation.

Over the Lussi LLCs' objection that the process was taking too long, the Corporation announced in July that it would act on the accommodation request "no later than November 10, 2020." JA|#71-40, #71-41|. Not until August 21 did the Accommodations Committee first meet with the Lussis. JA|#71-30p77-221|. Despite the Corporation's insistence that Mr. Lussi is impossible to deal with, the Corporation asked to deal directly with the Lussis, without counsel. JA|PX18¶4|. The videoconference proceeded like a deposition, with Mr. Weinberg posing 188 questions to Mr. Lussi, without

allowing him to ask about the Corporation's alleged financial and administrative burdens. JA|#71-30p77-221|.

When the Accommodations Committee demanded confidential financial and other information, the Lussi LLCs provided it, even though the requests went far beyond what was reasonably necessary to evaluate whether the request was reasonable and necessary to accommodate prospective residents. JA|PX 2¶35|. The information and documents confirmed that the Lussi LLCs bore a heavy financial burden for each passing month, as they serviced the group home's debt and other expenses with no offsetting revenue. *Id.*

In mid-September, the Lussis gave extensive written answers to the Accommodations Committee's written follow-up questions. JA|PX39|. The Accommodations Committee initiated no further communications with the Lussis. JA|PX 2¶36|. At the end of October, the Lussis forwarded a third-party septic report received from the prior owners. JA|PX40|.

Guy Cecala succeeded Mr. Daly as president in December. JA|PX23p10|.

The Corporation did not meet its November 10 deadline to respond to the request. JA|PX2¶10|. The Lussi LLCs emailed the Corporation,

demanding that, with November 10 having passed, the Corporation provide a firm date before December 25 for issuing its decision. JA|PX41|.

Four days later, on December 11, the Accommodations Committee issued its report to the Board. JA|#71-30|. The report followed President Daly's June suggestion that Mr. Lussi was a burden justifying denial:

> [Banbury House] will impose major administrative and financial burdens on the Corporation. In particular, based on Mr. Lussi's history of contentious, rule-breaking behavior and the vague, inconsistent or unverifiable representations the Lussis have made related to the Request, we believe that entering an accommodation agreement with the Lussis will lead to frequent, time-consuming, and potentially expensive disputes initiated by Mr. Lussi, potentially including additional litigation.

JA|#71-30p28|; *see* JA|PX14p273-75|.

The report's primary author, Mr. Weinberg, testified that, based on "some investigation," he "wouldn't want anything to do" with the Lussis— and that his feeling was the "consensus" view reflected in the committee's report. JA|PX 9p156-58|.

## I. Jan. to Apr. 2021: The Corporation scuttled a resolution denying the accommodation, instead proposing 23 conditions on approval.

At the Corporation's request, its counsel drafted a resolution denying the accommodation. JA|PX43|. The draft resolution reasoned that "any accommodation agreement with the Lussi family ... would invariably lead to

future disputes with Mr. Lussi, including disputes that likely would lead to time-consuming, costly litigation." JA|PX43|.

Rather than passing the resolution, the Board adopted a January 5 resolution that further defamed Mr. Lussi and convened a new Negotiations Committee. JA|#71-47|. The resolution said the Corporation is "willing to further engage in the 'interactive process.'" JA|#71-47p8|.

The Negotiations Committee on January 25 sent a proposed "accommodations agreement" in the form of a Memorandum of Understanding (MOU). JA|#71-55p2|. The draft MOU made approval contingent on 23 conditions, including that Ms. Lussi be the sole point of contact between the Corporation and the Lussi LLCs. JA|#71-55p3|.

The parties negotiated solutions to most conditions in February and March 2021, with the Lussi LLCs proposing drafts of a final agreement or binding MOU, and the Corporation responding with drafts of a non-binding MOU.[1] The Corporation's insistence on five points were particularly controversial in these exchanges:

---

[1] JA|#71-56p18-27|) (Lussi LLCs on Feb. 2); JA|#71-57p4-9| (Corporation on Feb. 9); JA|#71-58p9-25| (Lussi LLCs on Feb. 13); JA|#71-64p3-8|) (Corporation on Feb. 22); JA|#71-65p12-20| (Lussi LLCs on Feb. 25); JA|#71-66p4-9| (Corporation on Mar. 3); JA|#71-67p24-32| (Lussi LLCs on Mar. 9); JA|#71-68p13-18| (Corporation on Mar. 18).

- *Sole Contact* (¶ 1): Ms. Lussi, or a Corporation-approved successor, had to be the sole point of contact between the parties.

- *Guarantor* (¶ 4)*:* The non-party entities for the Lussis' other group homes had to guarantee the Lussi LLCs' obligations.

- *Septic* (¶ 9)*:* The Lussi LLCs had to provide an annual septic certification and install a meter creating daily monitoring reports measuring effluent (clean water) deep in the ground.

- *Dispute Resolution* (¶ 21): All disputes were subject to binding arbitration, in which the prevailing party would be entitled to its fees, with each side putting $100,000 into escrow to cover such fees.

- *Non-Binding:* The MOU had to be "subject to change, modification, or withdrawal, without penalty, by any Party prior to full execution of a comprehensive Accommodations Agreement."[2]

On March 18, after President Cecala emailed a draft non-binding MOU that still designated Ms. Lussi as the sole point of contact, JA|#71-68p13|, Mr. Lussi spoke at length with President Cecala. JA|PX2¶40|. Mr. Lussi expressed concern over the Corporation's insistence on a non-binding MOU, when the Corporation was reserving the right to require undisclosed additional and different terms in the ultimate accommodations agreement.

---

[2] *Id.*

4862-2724-6502, v. 3.1

JA|PX2¶40|. President Cecala encouraged the Lussis to propose alternative resolutions on the remaining issues. JA|PX2¶40|.

Two days later, the Lussi LLCs emailed the Corporation a revised proposed MOU. JA|#71-69p17-23|. They yielded on several points, including that Ms. Lussi would be the sole point of contact; that the disputes would be subject to arbitration, if the parties could not agree to a settlement within 60 days after notice of breach; that in the event of arbitration the parties each would deposit $50,000 into escrow; and even that the MOU would be non-binding. JA|#71-69p17-23|.

President Cecala emailed the Lussis on March 26, admonishing them for doing exactly what he orally suggested to Mr. Lussi on March 18: "Unfortunately, you did what we asked you not to do, which was to propose additional revisions to the MOU again. The Board's approval of the proposed MOU we sent you on Thursday, March 18, was conditioned on your acceptance of it without alteration." JA|#71-70p3|. Although adopting some of the Lussi LLCs' changes, President Cecala identified the guarantor provision, the septic provision, and the arbitration provision as non-negotiable. JA|#71-70p3-5|. He said the final agreement likely would have a pre-arbitration "cooling off period," but that "60 days is not in keeping with the goal of resolving disputes expeditiously." JA|#71-70p4|. Never mind that

the Corporation was the party to take seven months to respond to the June 2020 accommodation request, while also complaining about the cost of litigation.

President Cecala's March 26 email attached a further revised non-binding MOU. JA|#71-70p11|. *Id.* He said the Corporation would approve the group home "subject to the execution of a final Accommodations Agreement, if you sign this proposed MOU ***without alteration***." JA|#71-70p5| (emphasis in original).

### J. Apr. 2021: The Corporation unilaterally abandoned the interactive process, never to return.

On April 5, the Lussi LLCs replied with a further revised MOU. JA|#71-72p2, 208-215|. JA|#71-72p213|.

The parties' April 12 joint report advised the district court that the Corporation "is evaluating" the Lussi LLCs' April 5 draft and a "response will be sent out shortly." JA|#37, PX18¶9, PX45|. The Corporation emailed all shareholders on April 15 that it was "continuing to negotiate with the Lussi family." JA|PX46p3|.

The next day—with no further substantive communication with the Lussis—President Cecala sent an April 16 email to all Gibson Island residents that the Board had voted "to end negotiations with the Lussi family." JA|#71-75|; *see* JA|#71-74, PX23p16-17, PX45|. The Corporation revealed that on

April 15, the same day it told shareholders it was continuing to negotiate with the Lussis, the Board in closed session adopted a resolution that "no further negotiations with the Lussi family … are authorized." JA|#71-74p7|.

The Corporation refused to return to the interactive process, even as Mr. Lussi repeated his belief that the parties could work through the remaining conditions. JA|PX18¶10-16, PX47|.

### K. Mar. 2022: When the Lussi LLCs sent a revised draft MOU, with minimal revisions to the Corporation's March 2021 draft, the Corporation refused to negotiate.

Trying to jump-start the interactive process in March 2022, the Lussi LLCs sent a revised draft MOU that yielded on several more points from the Corporation's last March 2021 draft. JA|PX48p2-15|. The new draft MOU was non-binding, just as the Corporation wanted. JA|PX48p15|. Rather than the 60-day cooling-off period that the Corporation said was too long, the Lussi LLCs proposed "a thirty (30) day period, or any such shorter period as shall be reasonable and appropriate given the nature of the alleged breach." JA|PX48p14|. During that time, Dr. Varn would offer solutions. JA|PX48p14|. The March 2022 draft also offered Dr. Varn as a point of contact, along with Ms. Lussi, so the Corporation would not have to deal with Mr. Lussi directly. JA|PX48p9|.

Dr. Varn is CEO of PinnacleCare, a health care advisory service. JA|PX4¶ 2|. Years ago, he helped the Lussis in starting their group homes.

JA|PX4¶ 3|. It was his idea to serve as another point of contact and to aid in dispute resolution. JA|PX4¶ 7|. The Lussi LLCs forwarded Dr. Varn's confirmation of his agreement to serve these roles. |JAPX48p22|.

Dr. Varn offered his service because of his own distress helping residents struggle with the lack of housing to accommodate their disabilities: "Gibson Island needs a place for its residents to age, without having to go back to Baltimore or Washington." JA|PX4¶ 5|. He has "helped Gibson Island residents die at home." *Id.* He has "seen others have to move away because they could not take care of themselves sufficiently to remain in their homes, either with a spouse or alone, and because a group home setting was not available on Gibson Island." *Id.*

We ask the Court to imagine a reasonable reaction when this distinguished physician, former Board member, and former Club president offered to broker peace so that Gibson Island would have a place for its residents to age. Now consider the Corporation's actual reaction.

The Corporation said Dr. Varn would be a "puppet" for Mr. Lussi. JA|PX10p254|. That was President Cecala's testimony as the Corporation's Rule 30(b)(6) designee. *Id.* When asked the basis, President Cecala said that "Mr. Lussi generally is a control freak," and that the Corporation could not

believe that anyone willing to work with Mr. Lussi would be independent-minded. JA|PX10p255|.

The Corporation chose not to respond to the Lussi LLCs' March 2022 proposal, despite several follow-up attempts. JA|PX48p19-20|.

President Cecala, as the Corporation's designee, testified that the Corporation would "continue to refuse to reengage in the interactive process," for "as long as Mr. Lussi is a principal of [the Lussi LLCs]." JA|PX10p257|. The Corporation is "convinced … that it's impossible to deal with [Mr. Lussi] as a business partner in developing an assisted living facility on Gibson Island." JA|PX10p260|.

When asked what short-term undue financial and administrative burden the Corporation would incur by entering into an Accommodations Agreement with mutually satisfactory terms, President Cecala testified as designee that "I think that's an impossible question to answer," and that any answer would be "just hypothetical" and call "for speculation." JA|PX10p269-272|. Likewise, he could not testify with reasonable certainty to any alleged long-term burden. JA|PX10p272-73, 283-99, 324-28|.

**L. June to Sept. 2022: The Corporation removed compacted gravel portions of Banbury Road and made statements fueling escalating harassment.**

Just before that Rule 30(b)(6) deposition in June 2022, the Corporation removed a compacted gravel portion of Banbury Road that

Banbury House's prior owners improved in 2007. JA|PX2¶47, DX82p300|. The compacted gravel provided access for emergency vehicles, septic trucks, and other service vehicles, and the Lussis had informed the Corporation that it was meant to continue that function for the group home. JA|PX2¶47|.

At the deposition, the Corporation claimed a legal right and nondiscriminatory reason for the removal, and it claimed to have notified Mr. Lussi, through counsel, of an intent to do so in 2020. JA|DX82p301-304|. Its summary judgment opposition would instead submit a June 2022 email it sent after the removal and after the deposition. JA|#88-9p3, 6|. Casting even more doubt on that claimed motive, the Corporation's designee simultaneously asserted a nondiscriminatory reason in 2020 to order a netting barrier (never installed) that would have obstructed Banbury's House views—the fear of stray golf balls hitting residents. JA|DX82p304|. In 2020, however, the designee had forwarded a Board member's email that it was "[t]oo bad it isn't available in pink and orange stripes." JA|PX24p37| And in May 2020 a future Board member used a "wink" emoji next to the golf-ball pretext, followed by: "Should really add to his residents' view of the Bay. Middle finger to you, Lussi!" JA|PX37p2|.

In July 2022, "Lussi is a complete asshole!!!!" stickers appeared on road signs near Gibson Island and at its entrance. JA|PX2¶48|. In August, a

poster with a "Screw Lussi" rebus appeared in the Post Office, JA|PX2¶49|, and the State's Attorney for Anne Arundel County charged a Gibson Island resident with second-degree assault for a bizarre threatening comment against Mr. Lussi. JA|PX2¶50|. In September, a Waltjen brother stopped his vehicle to make vulgar comments to Mr. Lussi. JA|PX2¶51|. The Corporation knew these incidents were a problem and made public statements purporting to discourage confrontations in August and September. JA|DX85p4-5|.

Yet at the same time President Cecala made public comments escalating the us-against-Lussi tensions—stating on all-shareholder call and an all-shareholder email that "a single shareholder" was costing the Corporation millions of dollars in legal fees that all shareholders would bear through a special assessment. JA|PX2¶52|. These are the same fees and assessments that the Corporation always knew were the cost of an all-out fight against the group home. JA|PX24p20-21, 31-32|.

### M. Nov. 2022: The DOJ disagreed with the Corporation's "cramped and narrow analysis."

The United States filed a 28 U.S.C. § 517 statement of interest. JA|#94|. It urged the district court to "reject [the Corporation's] cramped and narrow analysis of whether a group home is able to provide 'essential

therapeutic benefits' to residents even under unequal, costly, or burdensome conditions." JA|#94p10|.

## N. Nov. 2023: The district court granted summary judgment, barely acknowledging the DOJ's submission.

The district court granted summary judgment for the Corporation. JA|#110|. It mentioned as background that the United States had filed a statement of interest, JA|#110p2, 10|, but its legal analysis did not reference that statement or track its analysis.[3] JA|#110p15-23|.

## Summary of Argument

This case highlights two grim realities. First, for a club or community to be exclusive, it must exclude people viewed as undesirable. Second, despite decades of legislation protecting disability rights as civil rights, disability discrimination remains socially acceptable in many circles.

The accommodation is necessary under the FHA and Maryland law because there is no other group home option on Gibson Island. It is reasonable, because it would impose no undue burden on the community.

---

[3] The district court also denied a motion in which the Lussi LLCs sought leave to file a second amended complaint adding factual details. JA|#110p27-29|. In opposing leave, the Corporation stressed that the amendment was unnecessary, because the Lussi LLCs were free to offer those details in summary judgment briefing. JA|#73|. The district court's opinion indeed addressed facts, such the June 2022 removal of the compacted gravel, that the Lussi LLCs had sought to add through the amendment. JA|#110p27|. Absent any effect on the district court's disposition of the case, there is no need to challenge the denial of leave to amend.

The Corporation denied the accommodation through unreasonable delay, unlawful conditions, terminating negotiations, and refusing to reopen them. The Lussi LLCs are entitled to declaratory relief requiring approval, or at least to a jury trial.

A jury must decide the Lussi LLCs' claims for disability discrimination and retaliation. There is direct evidence of discriminatory and retaliatory intent, and that same evidence would show pretext if a *McDonnell Douglas* analysis were necessary.

## Standard of Review

When reviewing a ruling on cross-motions for summary judgment, the Court separately examines each motion de novo, viewing "the facts and all reasonable inferences drawn therefrom ... in the light most favorable to the nonmoving party." *Aleman v. City of Charlotte*, 80 F.4th 264, 283-284 (4th Cir. 2023).

## Argument

## I.     The Corporation illegally denied a reasonable accommodation.

### A. Fair housing laws protect efforts to establish for-profit group homes in the face of disability discrimination.

For-profit group homes play a vital role in fair housing. *Oconomowoc Residential Servs. v. City of Milwaukee*, 300 F.3d 775, 787 (7th Cir. 2002). The FHA's "reasonable accommodations" requirement, 42 U.S.C.

§ 3604(f)(3)(B), "specifically targeted" land-use restrictions having a "discriminatory effect" because "the disabled were not able to live safely and independently without organized, and sometimes commercial, group homes." *Groome Res. v. Par. of Jefferson,* 234 F.3d 192, 201-202 (5th Cir. 2000).

"It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Under the FHA, it is illegal "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—(A) that buyer or renter; (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1). The FHA prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" based on disability. 42 U.S.C. § 3604(f)(2). "Discrimination" includes refusing reasonable accommodations to "rules, policies, practices or services" necessary to allow persons with disabilities equal opportunity to use a dwelling. 42 U.S.C. § 3604(f)(3)(B).

4862-2724-6502, v. 3.1

The FHA prohibits "land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." *Wis. Cmty. Servs. v. City of Milwaukee,* 465 F.3d 737, 748 n.4 (7th Cir. 2006) (quoting H.R. Rep. No. 100-711, at 24 (1988)). Such "seemingly 'neutral rules and regulations,' even those involving commercial/noncommercial zoning distinctions, nonetheless had a discriminatory effect on the housing choices available for the disabled." *Groome,* 234 F.3d at 201-202.

The FHA requires accommodations when they are "(1) reasonable and (2) necessary (3) to afford [persons with disabilities] equal opportunity to use and enjoy housing." *Bryant Woods Inn v. Howard Cnty.,* 124 F.3d 597, 603 (4th Cir. 1997). "An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it." *Valencia v. City of Springfield,* 883 F.3d 959, 968 (7th Cir. 2018) (citation omitted). Courts may consider "the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations and the benefits that the accommodation would provide to" persons with disabilities," and "whether alternatives exist to accomplish the benefits more efficiently." *Bryant,* 124 F.3d at 604. An accommodation is not "reasonable" if it imposes "undue financial and administrative burdens." *Id.* This

determination is "a fact-specific inquiry" that balances the benefits the accommodation provides to persons with disabilities against its costs and impact on "the legitimate purposes and effects of the existing regulations." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013) (quoting *Bryant,* 124 F.3d at 604).

The "necessary" prong requires "a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the" person with a disability. *Bryant,* 124 F.3d at 604. Thus, "group living arrangements can be essential for disabled persons who cannot live without the services such arrangements provide." *Oconomowoc*, 300 F.3d at 787.

Courts "have reconciled the phrases 'reasonable accommodation' and 'undue hardship' in a practical way," holding that to defeat a motion for summary judgment, a plaintiff "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). Thus, a "court at the summary-judgment stage must consider first whether the plaintiff's own requested accommodation 'seems reasonable on its face' before turning to

consider a defendant's objections and counterproposals."[4] *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1269 (11th Cir. 2019).

"A denial of a request need not be explicit, but rather may be treated as a 'constructive' denial based on the decision maker's conduct." *Scoggins*, 718 F.3d at 271-272 (citing *Groome*, 234 F.3d at 199).

The "essential question" is whether disabled individuals "have an equal opportunity to live in the dwellings *of their choice*, not simply an opportunity to live somewhere in the [area]." *Schwarz v. City of Treasure Isl.*, 544 F.3d 1201, 1225 (11th Cir. 2008); *see Dr. Gertrude A. Barber Ctr. v. Peters Twp.*, 273 F. Supp. 2d 643, 654 (W.D. Pa. 2003) (alternative to group home deprived prospective residents of "home and neighborhood of their choice").

These authorities support the United States' proposed standard, under which "the Court should examine whether [the] conditions would have afforded persons with disabilities an 'equal opportunity to use and enjoy' the dwelling of their choice, including whether they would unreasonably or

---

[4] Without addressing *Barnett*, the Third Circuit in *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 110-112 (3d Cir. 2018), rejected DOJ guidance and put the burden on a plaintiff to plead that her requested accommodation was necessary in light of the alternatives offered. *Schaw* is better-reasoned and consistent with *Barnett*. Even under *Vorchheimer*, the Lussi LLCs would prevail because an "accommodation that does not provide *equal* opportunity, or that provides equal opportunity to *use* but not to *enjoy,* will not satisfy [the reasonable-accommodation] requirement." *Id.* at 109.

unequally impact or interfere with the ability to locate, establish, and maintain community housing for persons with disabilities." JA|#94p10|.

## B. Gibson Island's first-ever group home is a reasonable and necessary accommodation for persons with disabilities.

The proposed group home is necessary, because Gibson Island has no group homes for residents with disabilities requiring such living arrangements, and it is reasonable, because it would impose no undue burdens. The Corporation's purported "alternative" is a series of unlawful conditions. To summarize:

- Gibson Island has no other group homes or proposed group homes.

- The parties agree, as a general matter, the business-purpose restriction must yield to fill that need for persons with disabilities.

- This specific proposal meets all zoning and environmental requirements, as the County has confirmed.

- The Corporation's conditions impose unnecessary and unlawful costs and burdens that do not apply to others.

### 1. Federal Law

The district court's ruling occupies a hypothetical world, in which burdens on group-home providers are distinct from the burdens on the persons they seek to serve. For example, it found that the Lussi LLCs "do not

point to any evidence to show that the Banbury Property's future residents would bear the costs of the Septic Provision, or to show how these costs would prohibit the Banbury Property from operating as a group home." JA|#110p21| (citing *Bryant*, 124 F.3d at 604-05). It also found no "'constructive denial' of Plaintiffs' requests, because Plaintiffs do not claim that the four disputed conditions in the March 26, 2021, MOU prevent them from operating the Banbury Property, or present an insurmountable burden." JA|#110p23|.

The Court's *Bryant* decision stands for no such propositions, which conflict with the federal and state fair-housing schemes. When writing "reasonable accommodation" into the FHA, Congress recognized that "organized, and sometimes commercial, group homes" are essential to fair housing. *Groome,* 234 F.3d at 201-202. Prices reflect costs, and unnecessary cost increases will affect prices.[5]

---

[5] Even a $57 filing fee, coupled with regular inspections, may be "a significant burden on the disabled," when "not imposed on other residents." *Cmty. Hous. Tr. v. Dep't of Consumer & Regul. Affs.*, 257 F. Supp. 2d 208, 224 (D.D.C. 2003); *Potomac Grp. Home Corp. v. Montgomery Cnty.*, 823 F. Supp. 1285, 1298 (D. Md. 1993) (selective enforcement of hearing requirement, "which is based essentially on illegal prejudices of the community, causes great harm to plaintiffs because of resulting delays and burdensome costs").

4862-2724-6502, v. 3.1

*Bryant* helps highlight the bleak status quo for persons with disabilities who wish to live on Gibson Island, and the discriminatory nature of the Corporation's conditions. In *Bryant*, a group home already serving eight seniors sought a variance to expand to 15 beds without additional parking, even though its existing driveway was already overflowing. 124 F.3d at 599, 604. But "numerous other group homes existed in [town] having from 18 to 23% vacancy rates." *Id.* at 601.

This oversupply was key to *Bryant*'s holding that the variance was not "necessary." The variance was "not aimed at permitting handicapped persons to live in group homes in residential communities—that … is already permitted—but at *expanding* its group home size from 8 to 15 persons." *Id.* at 605. There was "no evidence that group homes are not financially viable with eight residents," and the record showed "that almost 30 such homes operate viably in Howard County with 8 or fewer residents." *Id.* Nor was there evidence that expansion "would be therapeutically meaningful." *Id.* "A handicapped person desiring to live in a group home in a residential community in Howard County can do so now at Bryant Woods Inn under existing zoning regulations, and, if no vacancy exists, can do so at the numerous other group homes at which vacancies exist." *Id.*

4862-2724-6502, v. 3.1

It was only because of that oversupply that *Bryant* discussed the lack of therapeutic benefit to the residents: "The only suggestion in the record of advantage from the proposed expansion is that it will financially assist ... a for-profit corporation." 124 F.3d at 605. "But the proper inquiry is not whether 'a particular profit-making company needs such an accommodation, but, rather do such businesses as a whole need this accommodation. Otherwise, by unreasonably inflating costs, one business would get such an accommodation while another, better run, did not.'" *Id.* (quoting *Smith & Lee Assocs., Inc. v. City of Taylor*, 13 F.3d 920, 932 (6th Cir. 1993)). That holding presupposed an existing adequate supply of group homes. The quoted language came from *Smith & Lee*, as part of an inquiry in which "[b]efore deciding whether [defendant] must accommodate the handicapped by permitting twelve-person homes, the court must first know if that accommodation is needed to supply a reasonable number of such homes." 13 F.3d at 931.

Gibson Island has no group homes, and the Corporation's conditions are designed to keep it that way. They grew from a community-wide brainstorming session on ways to "defend deeds and agreements v[ersus] FHA." JA|PX24p21|. The Corporation was responding to the community's outrage

over the very notion of a group home. *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 366 (4th Cir. 2008).

There is no genuine dispute that a group home is necessary to provide the first-ever opportunity for persons who wish to live on Gibson Island and whose disabilities require group-home support. Nor is there any dispute that a nine-bed home is a reasonable means of filling that need; the County approved a nine-bed home, and the Corporation is proposing conditions on approval of a nine-bed home.

The dispute is whether the Corporation has approved this reasonable and necessary accommodation; or has in effect denied the accommodation by delaying its response, imposing conditions that deny equal housing opportunity, cutting off the interactive process when the Lussi LLCs would not accept those conditions, and then refusing to resume negotiations. Under the DOJ's summary of the case law—whether the "conditions would have afforded persons with disabilities an 'equal opportunity to use and enjoy' the dwelling of their choice, including whether they would unreasonably or unequally impact or interfere with the ability to locate, establish, and maintain community housing for persons with disabilities" JA|#94p10|—the Corporation's conditions do not pass legal muster.

Contrary to the district court's treatment of environmental concerns as a "Get Out of FHA Free" card, the septic conditions are a stark violation. When a shareholder wrote from his law firm account to suggest "injunctive relief pending approvals of septic expansion," assuming "we are in agreement that this activity is inappropriate for this location," President Daly's only pushback was to have further conversations "on the phone," while stressing that the litigation steering committee welcomed such input. JA|PX24p25|. "Septic" was part of the Corporation's "360 degree look at how to block [Craig Lussi], even if the group home is 'by right' consistent with FHA." JA|PX24p31|. But the County refused the Corporation's pleas to withdraw the building permit. JA|PX58p1|. The County reinspected the property and confirmed that "the system is adequate for a 9 bed assisted living facility." JA|PX58p2|.

Yet the Corporation demanded that Banbury House be subject to *daily* septic monitoring—an ad hoc burden that is not required under state or local law, and that no other property faces. Citing only a vague "need to preserve the Island's environment"—backed by no law, regulation, or expert opinion— the Corporation insisted in March 2021 that the Lussi LLCs sign its MOU with "***___without alteration___***." JA|#71-70p4-5|. The bold, italics, and underline were the Corporation's emphasis. When the Lussis dared to

respond with revisions on April 5, JA|#71-72p2, 208-215|, the Corporation

broke off negotiations and never returned to the table. JA|#71-74|.

The ultimatum's other conditions fare no better, even if the

Corporation did not leave the same damning paper trail. The interactive

process is not an opportunity to push an accommodation's cost—including

deposits, fees, insurance, or indemnity—to the person with a disability.[6] *See*

*United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1417 (9th

Cir. 1994) (courts should scrutinize fees "with unequal impact, imposed in

return for permission to engage in conduct that, under the FHAA, a landlord

is required to permit"). The guarantor condition is a classic improper

---

[6] HUD-DOJ Joint Statement, Reasonable Accommodations Under the Fair Housing Act (2004), at 9 ("Housing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation."); *Alboniga v. Sch. Bd. of Broward Cnty.*, 87 F. Supp. 3d 1319, 1344-45 (S.D. Fla. 2015) (in ADA case, school board could not require student to pay for additional vaccinations and liability insurance); *Parris v. Pappas*, 844 F. Supp. 2d 271, 277 (D. Conn. 2012) (violation of FHA to use reasonable accommodation request as leverage to coerce a new lease requiring payment for sewage repairs); *United States v. Savannah Pines*, No. 4:01-cv-03303 (D. Neb. Nov. 29, 2001) (consent decree against housing provider seeking to require insurance, a non-refundable security deposit, and limiting residents to certain areas), www.justice.gov/crt/housing-and-civil-enforcement-cases-documents-79; *United States v. Twining Serv. Corp.*, No. 2:05-cv-05177 (E.D. Pa. Sept. 30, 2005) (enjoining defendant from requiring that the owner provide indemnity), www.justice.gov/crt/housing-and-civil-enforcement-cases-documents-355.

4862-2724-6502, v. 3.1

condition, requiring (beyond the Lussis' existing insurance) indemnity from the entities for the Lussis' other facilities

The dispute resolution condition—including prevailing-party fees and a $100,000 escrow—would force disputes into a forum in which the DOJ has no power to intervene, and would expose the Lussi LLCs to potential fee awards they would not face under the FHA. This appeal proves the risk. The Corporation persuaded the district court to effectively ignore the DOJ's guidance, and the district court's analysis included manifest errors. *Infra* § II. In an arbitration, the United States would have no right to submit a 28 U.S.C. § 517 statement of interest, there would be no appeal to this Court from a erroneous arbitrator's ruling, and the Lussi LLCs would be footing the Corporation's multi-million dollar bill. No such conditions attach to other residential or commercial projects.

The district court brushed these concerns aside with a false distinction, viewing the conditions as affecting only the Lussi LLCs and not prospective residents. The FHA protects "any person associated with" persons with disabilities. 42 U.S.C. § 3604(f)(1)(C), (2)(C). Discrimination includes any "refusal to make reasonable accommodations ... when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Private group homes are key to securing

such necessary accommodations, *supra* § I.A, and the Corporation is imposing unnecessary conditions, costs, and risks that would affect the cost to residents, delay the group home, or (as its shareholders so dearly hope) thwart any group home.

Right now, the Lussis are the only ones willing to pursue this accommodation and endure the insular community's vitriol. If the Corporation grinds the Lussis down, there will be no group home on Gibson Island. It is inconceivable that someone else would be undeterred. Remember: the "***without alteration***" ultimatum included a statement that the MOU was non-binding, leaving wiggle room for the Corporation, whose constituents would love to see the group home proposal die.

Although the district court did not address the Corporation's argument that Mr. Lussi himself is a burden, we expect the Corporation to devote much of its brief to that point. The DOJ was "unaware of any case in which a court found an 'undue burden' under the FHA based solely on personal animosity or distrust among the parties." JA|#94p12|. It also observed that "this is presumably mitigated by the parties' agreement to name Jeannette Lussi as [Corporation's] sole point of contact." *Id*. The Corporation balked even when Dr. Varn offered to serve as a point of contact and mediator, because it

thought anyone willing to work with Mr. Lussi had to be a "puppet."
Statement § K.

Nor is there any workable standard under which the proponents of fair-housing rights could themselves be the burden. Zeal is essential to fighting entrenched opposition to fair housing rights; proponents inevitably are viewed as troublemakers. It is hard to imagine anyone with less zeal fighting the well-heeled opposition to fair-housing rights on Gibson Island.

Although the Corporation insists that the conditions protect against Mr. Lussi's purported litigiousness, the Corporation *chose* to fight as hard as possible and to bear that cost. In March 2020, the Corporation's Treasurer (a lawyer) told President Daly that "we need to be prepared to fight until the end and you should get the community ready for the fight," because "the community overwhelming opposes the change," but he warned that legal fees "could be expensive." JA|PX24p20|. President Daly indeed vowed to "do our best to defend deeds and agreements v[ersus] FHA." JA|PX24p21|. When a shareholder encouraged "a special assessment to be sure a sufficient war chest exists," President Daly responded that "a legal defense fund is being created by a resident to help assure adequate legal funding for the battle." JA|PX24p32|. The Corporation chose a scorched-earth approach, calling it

"a 360 degree look at how to block [Craig Lussi], even if the group home is 'by right' consistent with FHA." JA|PX24p31|.

The Lussis' zeal is in fighting for legally protected disability rights, and the Corporation's zeal is in fighting "v[ersus] FHA." JA|PX24p21|. The Corporation's conditions, which impose unnecessary obstacles, are unlawful.

### 2. Maryland Law

The Lussi LLCs' state-law claims (Count II) are even stronger. Although the district court's opinion mentioned those state-law claims in the introduction and background, JA|#110p1-3|, and at the end dismissed the "FHA discrimination claims and related state law claims," JA|#110p29|, its analysis was restricted to the FHA. JA|#110p15-27|.

Because the Lussi LLCs made a prima facie case of reasonableness under Maryland law, the Corporation bore the substantive burden to show that the requested accommodation was unreasonable. *Bd. of Dirs. of Cameron Grove Condo., II v. State Comm'n on Hum. Rels.*, 63 A.3d 1064, 1075 (Md. 2013).

A person may not "refuse to make reasonable accommodations in rules, policies, practices, or services when the accommodations may be necessary to afford an individual with a disability equal opportunity to use and enjoy a dwelling." Md. Code, State Gov't § 20-706(b)(4). Maryland's

policy is "(1) to provide for fair housing throughout the State to all, regardless of race, color, religion, sex, familial status, national origin, marital status, sexual orientation, gender identity, disability, or source of income," and "(2) to that end, to prohibit discriminatory practices with respect to residential housing by any person, in order to protect and ensure the peace, health, safety, prosperity, and general welfare of all." Md. Code, State Gov't § 20-702(a).

Consistent with the policy, "once the complaining party proves a prima facie case of reasonableness, the defending party ultimately bears the burden of showing the accommodation is unreasonable." *Cameron Grove*, 63 A.3d at 1075. The Supreme Court of Maryland rejected the portion of *Bryant* putting the ultimate burden of persuasion on the plaintiff. *Id.* at 1073-1075. That holding on the substantive state-law burden controls. *See, e.g.*, *Commodities Rsrv. Corp. v. M/S Roumania*, 806 F.2d 501, 503 (4th Cir. 1986).

A group home is necessary to allow, for the first time, an opportunity to live on Gibson Island for persons whose disabilities require those living arrangements. There is no genuine dispute that the Lussi LLCs made at least a prima facie case that their proposal was reasonable to meet that need. Thus, the substantive burden shifted to the Corporation to show that the Lussi

LLCs' proposal was unreasonable, as submitted, such that the Corporation's conditions were necessary to make it reasonable. For the reasons discussed in Section I.B.1, the Corporation cannot meet that burden and, at best for the Corporation, its defenses presented a jury question.

### C. The Lussi LLCs are entitled to summary judgment or a jury trial on their claim for declaratory relief.

At minimum, the Court should reverse the summary judgment entered in the Corporation's favor, construing the facts and all reasonable inferences therefrom in the Lussi LLCs' favor. *Aleman*, 80 F.4th at 283-284.

The Court should further order entry of summary judgment declaring that the Corporation must grant the Lussi LLCs' June 2020 accommodation request. Even reviewing the facts and inferences in the Corporation's favor, the conditions would not have "afforded persons with disabilities an 'equal opportunity to use and enjoy' the dwelling of their choice, including whether they would unreasonably or unequally impact or interfere with the ability to locate, **establish**, and maintain community housing for persons with disabilities" JA|#94p10| (emphasis added). Unnecessary costs imposed on the establishment of a group home are, by definition, unreasonable.

The Corporation's April 2021 ultimatum that Mr. Lussi accept its unreasonable conditions "***without alteration***," JA|#71-70p5|, followed by its termination of negotiations when Mr. Lussi proposed alterations,

4862-2724-6502, v. 3.1

unlawfully denied an accommodation that was (1) reasonable and (2) necessary (3) to afford individuals with disabilities their first-ever equal opportunity to use and enjoy Gibson Island housing.

This conclusion is particularly clear under Count II, on which the Corporation bears the ultimate burden of showing unreasonableness, because the Lussi LLCs have made a prima face case that the accommodation is necessary and reasonable. *Cameron Grove*, 63 A.3d at 1073-1075. In *Cameron Grove*, Maryland's highest court embraced the Seventh Circuit's decision in *Oconomowoc*—which affirmed a grant of summary judgment requiring the grant of a variance. 300 F.3d at 787. Under that substantive burden of proof, the defendant's burden of "showing a lack of reasonableness or undue hardship amount to the same thing." *Id.* (citing *Walton v. Mental Health Ass'n*, 168 F.3d 661, 670 (3d Cir. 1999)). The Corporation has offered no affirmative evidence that can meet that burden.

In the alternative, the Court should order summary judgment declaring that the Corporation must grant the Lussi LLCs' March 2022 request. By then, the Lussi LLCs had yielded on almost everything—except for the guarantor and septic conditions. Statement § K. Mr. Lussi was even offering Dr. Varn, a former Board member, as an alternate point of contact, so that the Corporation would not have to deal with Mr. Lussi. The Board

refused even to respond, only revealing in deposition that it viewed Dr. Varn as Mr. Lussi's "puppet" and that it would never negotiate so long as Mr. Lussi remained affiliated with the Lussi LLCs. *Id.* The Corporation's claim to have offered an "alternative" does not apply to the March 2022 request, because the Corporation had revoked the purported alternative.

If the Court were to hold summary judgment appropriate against the Corporation on the March 2022 request, but not on the June 2020 request, the Lussi LLCs are willing to forgo declaratory relief on the June 2020 request. Although they would be taking materially worse terms, including unlawful conditions, they wish to get the project back on track after several lost years, for the reasons Dr. Varn cited: "Gibson Island needs a place for its residents to age, without having to go back to Baltimore or Washington." JA|PX4¶5|. To be clear, they still would pursue money damages, such as the costs of delay, because the Corporation denied the June 2020 request on discriminatory grounds and retaliated against the Lussi LLCs. *Infra* § II.

## II. The Corporation engaged in unlawful discrimination and retaliation.

Given the Corporation's many unlawful acts described in Section I, the district court erred in granting summary judgment for the Corporation on disability discrimination and retaliation.

4862-2724-6502, v. 3.1

An aggrieved person—"any person who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur," 42 U.S.C. § 3602(i)—may bring a civil action under the FHA. 42 U.S.C. § 3613(a).

It is unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter"—or to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling"—"because of a handicap of (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1)-(2). Retaliation is also prohibited: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted [under § 3604]." 42 U.S.C. § 3617. An "FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages." *Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415, 421 (4th Cir. 2018).

4862-2724-6502, v. 3.1

Maryland law is similar. It is unlawful to "discriminate in the sale or rental of, or otherwise make unavailable or deny, a dwelling to any buyer or renter"—or to "discriminate against any individual in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with the dwelling"—"because of a disability of: (i) the individual; or (ii) an individual residing in or intending to reside in the dwelling after it is sold, rented, or made available." Md. Code, State Gov't § 20-706(b)(1)-(2). "A person may not coerce, intimidate, threaten, interfere with, or retaliate against any person: (1) in the exercise or enjoyment of any right granted or protected by this subtitle; (2) because a person has exercised or enjoyed any right granted or protected by this subtitle; or (3) because a person has aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by this subtitle." Md. Code, State Gov't § 20-708.

Federal law requires a showing of "but for" causation. *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 236 (4th Cir. 2016). In Maryland, however, it is enough in all status-based discrimination cases that unlawful discrimination was "even one motivation, among other motivations that are legitimate." *Romeka v. RadAmerica II, LLC*, 301 A.3d 26, 39 (Md. 2023); *see, e.g.*, *Ruffin Hotel Corp. of Md. v. Gasper*, 17 A.3d 676, 687 (Md. 2011).

4862-2724-6502, v. 3.1

A plaintiff may create a jury question through either direct evidence of discrimination or through the *McDonnell Douglas* burden-shifting framework. *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990).

"Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested … decision." *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013). Any "indication of discriminatory motive … may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013); *see Walker v. Todd Vill., LLC*, 419 F. Supp. 2d 743, 748 (D. Md. 2006) (reasonable juror entitled to find from a single statement that defendant acted on discriminatory motivation). It is not necessary to prove that a defendant was "motivated by dislike for, or animosity against, people with disabilities." *Bryant Woods Inn, Inc. v. Howard Cnty.*, 911 F. Supp. 918, 929 (D. Md. 1996). "Congress intended equally to prohibit discrimination resulting from false and over-protective assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose." *Id.* Direct evidence "refers to the

causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

There is direct evidence that as to the Banbury House proposal, just as with the Lussis' prior group-home efforts, Statement § B, the Corporation's goal was to *block* fair-housing rights. When Corporation learned of the plan, it vowed to "do our best to defend deeds and agreements v[ersus] FHA." JA|PX24p21|. It took a "360 degree look at how to block [Craig Lussi], even if the group home is 'by right' consistent with FHA," identifying the septic issues as a way to block the plan. JA|PX24p31|. It lobbied the County to withdraw the building permit, based on septic issues the County found meritless. Statement § F. When the Corporation formed its Accommodations Committee, President Daly preemptively suggested that the Lussis themselves were an undue burden. Statement § G. The Accommodations Committee dragged its heels, taking six months to recommend denying the request. Statement §H. The Corporation instead formed a Negotiations Committee that never wavered from its commitment to a septic condition, despite the County already rejecting those concerns six days before the application. Statement § I. It ended negotiations, emphasizing Mr. Lussi's pushback on that same septic condition. Statement § J.

4862-2724-6502, v. 3.1

All the while, the Corporation's shareholders were opposing any group home, expressing discriminatory views against individuals with disabilities. Those community views are attributed to the Corporation because it acted in response to those views. *A Helping Hand*, 515 F.3d at 366 ("no reasonable juror could conclude that the County Council did not know of—and legislate in response to—the community's opposition"). This concept applies in FHA cases. HUD-DOJ Joint Statement, *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act*, at 13 (2016) (defendant "violates the law if it blocks a group home or denies a reasonable accommodation because of neighbors' stereotypical fears or prejudices about persons with disabilities."); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1234 (2d Cir. 1987) (FHA violation to act in response to community's opposition to desegregation).

As to retaliation, the Court need only look at the contested evidence about the removal of the compacted gravel in June 2022. Statement § M. President Cecala offered a nondiscriminatory reason. *Id.* But in the same breath he also offered a demonstrably false nondiscriminatory reason for the Club's 2020 efforts to putting up netting that would obstruct Banbury House residents' views. Just look at his own email exchange from May 2020:

From: Kevin Reed <kevinfrancisreed@gmail.com>
Date: May 8, 2020 at 4:25:22 PM EDT
To: Guy Cecala <guy@imfpubs.com>
Cc: "Kanne, Jeff" <jkanne@natadvisors.com>
Subject: Re: netting for barrier between golf course and Lussi property

Fine with me. Too bad it isn't available in pink and orange stripes.

KFR

On Fri, May 8, 2020 at 3:43 PM Guy Cecala <guy@imfpubs.com> wrote:
Here is what David Grossman has identified as a netting barrier for the above. It can be used both on a temporary and permanent basis (potentially with tree plantings).

https://www.networldsports.com/golf/ball-stop-nets/ball-stop-post-net-system-multi-sport.html

Looking at 1-inch netting 20 feet high and 196 feet long. Price is $5,125.

Lawyers have signed off on ordering.

Guy

JA|PX24p27|. A future Board member involved in that effort used a wink emoji to convey that the golf-ball explanation was a pretext for interfering with prospective residents' views:

K
PS. GI Club is putting up a huge net in front of his new house on the edge of the golf course so balls won't go into his yard ;-) Should really add to his residents' view of the Bay. Middle finger to you, Lussi!

JA|PX37|.

These emails also underscore how a jury could find but-for causation under federal standards for discrimination and retaliation. Despite the acrimony over the Mountain Road development, culminating in the Club expelling Mr. Lussi in November 2019, the Corporation (through Ms. Kanne) was initially enthusiastic when Mr. Lussi offered to buy 430 Magothy Road in December 2019. Statement § B; JA|PX29|. The switch flipped from enthusiasm to opposition once the Corporation realized the purchase was

another group-home effort. Ms. Kanne spoke with a housing attorney and advised President Daly not to explain the rejection because "if the Corporation were to provide the reasons the offer is subpar, it is quite likely Lussi could amend his offer to address those concerns." JA|PX31p4|. Her husband, a Board member, was a party to the email exchange, just five months later, wishing the barrier were in "pink and orange stripes." JA|PX24p27|. There is ample evidence for a jury to decide that the Corporation would tolerate Mr. Lussi, and even do business with him, but for his efforts to build fair housing.

The Corporation's retaliation continued past June 2022. When community members antagonized and threatened Mr. Lussi, the Corporation publicly purported to encourage peace. Statement § M. But President Cecala broadcasted that "a single shareholder" was costing the Corporation millions of dollars in legal fees that all shareholders would bear through a special assessment. JA|PX2¶52|.

The evidence and inferences, when viewed in the Lussi LLCs' favor, show a continuous sequence of discriminatory and retaliatory intent. From 2016 to present, the Corporation has acted in response to influential shareholders who think a group home will sully their community. The chronology—including events before January 2020 on the discrimination

claim and before June 2020 on the retaliation claim—is relevant to show the Corporation's motive, intent, plan, and knowledge. *See* Fed. R. Evid. 404(b). There is direct evidence of discrimination and retaliation and, in any event, that same evidence would show pretext under a *McDonnell Douglas* framework.

On the FHA claims, a reasonable jury could find that disability discrimination and retaliatory intent were the but-for cause of the Corporation's adverse actions: delaying a response to the application; planning from the beginning to deny the accommodation on the Lussi-as-burden theory, even as they advocated for an interactive process; insisting on unlawful and pretextual conditions; withdrawing from negotiations in April 2021; refusing even to consider the June 2022 application; removing the compacted gravel; and stoking public retribution against Mr. Lussi for costing the Corporation the legal fees it always knew were the price of its 360-degree strategy.

On the state-law claims at Count II, the analysis is even clearer. It is sufficient to show that unlawful discrimination was even one contributing factor. *Ruffin*, 17 A.3d at 687.

The district court simply failed to view the evidence and inferences in the light most favorable to the Lussi LLCs. For example, the district court

found "it is undisputed that the Septic Provision is designed to safeguard Gibson Island's environment," JA|#110p20|, despite the direct evidence that the septic condition was designed to thwart a group home, even after the County's repeated findings that the septic system was adequate. For another example, the district court found that tearing up the gravel road could not be retaliation because the road belonged to the Corporation, and the road could still be used for its historical purposes. The Lussi LLCs very much contested, and still contest, that the Corporation had the right to dig up the road. JA|#71-3p10-11, PX2¶47|. Regardless, an act within a defendant's rights—such as discharging an at-will employee or imposing a hearing requirement—is unlawful when it results from a discriminatory or retaliatory motive. *See, e.g.*, *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 254 (4th Cir. 2015).

Going against decades of discrimination law, the district court even found that President Daly's acts and statements were irrelevant. It reasoned that "Mr. Daly was no longer part of [the] Board when negotiations began with Plaintiffs to establish the group home in 2021." JA|#110p24|. He formulated the Corporation's 360-degree strategy, in response to the community's discriminatory views, and suggested to the Accommodations Committee (which included future President Cecala) that it could deny the accommodation on the Lussi-as-burden theory. The Corporation responded

under President Cecala only because the Accommodations Committee missed its November 2021 deadline to respond. None of these details is necessary to create a jury question, since a jury could attribute the community's overtly discriminatory views to the Corporation. *A Helping Hand*, 515 F.3d at 366. Still, they underscore the gravity of the error.

Even worse, the district court found that President Daly's comments could not establish discriminatory motive because his "statements do not reference the disabilities of the Banbury Property's potential residents. Given this, the statements simply do not demonstrate that discriminatory animus was a motivating factor in [the Corporation's] response to Plaintiffs' request for a reasonable accommodation." JA|#110p24|. President Daly vowed to "do our best to defend deeds and agreements v[ersus] FHA." JA|PX24p21|. He spearheaded a "a 360 degree look at how to block [Craig Lussi], even if the group home is 'by right' consistent with FHA." JA|PX24p31|. These statements are direct evidence of an intent to thwart the FHA; and, in any event, the district court's findings would gut the very concept of pretext.

The district court also noted "no evidence that "any potential residents … would even be aware of the septic monitoring system." JA|#110p22|. The entire community, including prospective residents, is

aware of this requirement, which reinforces stereotypes that individuals with disabilities are unclean. Because of this litigation, everyone knows:

- under President Cross in 2016, the Corporation had "no interest in the assisted living concept," JA|PX20, PX11p126|;

- under President Daly in 2020, the Corporation put septic issues on its list of ways to thwart the "inappropriate" use of the property as a group home, JA|PX24p25|;

- under President Cecala, the Corporation made the septic condition non-negotiable in 2021 and forever broke off discussions;

- the Corporation took these actions while shareholders called people with disabilities dirty and undesirable;

- the Board has worked hand-in-hand with these same shareholders, without pushing back against their prejudiced comments;

- the Corporation will never approve a group home in any way affiliated with Mr. Lussi; and

- Gibson Island thus will have no group home in the foreseeable future if the Corporation prevails.

These errors underscore how much work remains to be done, decades after Congress amended the FHA to prohibit disability discrimination.

4862-2724-6502, v. 3.1

Disability rights are civil rights, and affirmance of summary judgment would set those rights back by decades.

## Conclusion

As to declaratory relief, the Court should reverse and remand with instructions to enter summary judgment that the Corporation must grant the June 2020 accommodation request or, alternatively, the March 2022 accommodation request. Alternatively, the Court should order a jury trial.

As to damages, the Court should reverse and remand for a jury trial.

Respectfully submitted:

/s/ *Steven M. Klepper*
Steven M. Klepper
Geoffrey H. Genth
Justin A. Redd
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030
sklepper@kg-law.com
ggenth@kg-law.com
jredd@kg-law.com

Matthew D. Skipper
Jeffrey A. Kahntroff
SKIPPER LAW, LLC
2127 Espey Court, Suite 100
Crofton, Maryland 21114
(410) 919-2121
matt@skipperlawllc.com
jeff@skipperlawllc.com

*Counsel for Appellants*

4862-2724-6502, v. 3.1

## Statement Respecting Oral Argument

The district court's opinion provides communities with a roadmap to thwart disability rights protected under fair-housing laws. The dispute is important enough that the United States submitted a statement of interest, with which the district court's opinion conflicts. This important case warrants oral argument and a reported opinion.

/s/ <i>Steven M. Klepper</i>
Steven M. Klepper

4862-2724-6502, v. 3.1

## Certificate of Compliance

I hereby certify that this brief complies with: (1) the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B), in that it contains 12,878 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional typeface using Microsoft Word in 14-point Georgia font.

*/s/ Steven M. Klepper*
Steven M. Klepper

4862-2724-6502, v. 3.1

## Certificate of Service

I hereby certify that, on March 19, 2024, I filed this brief with the Court's CM/ECF system, which will cause copies to be served on all counsel of record.

/s/ *Steven M. Klepper*
Steven M. Klepper
