# 23-2295

# United States Court of Appeals
### for the
# Fourth Circuit

GROUP HOME ON GIBSON ISLAND, LLC;
ASSISTED LIVING WELL COMPASSIONATE CARE 2, LLC,

*Plaintiffs-Appellants*,

— v. —

GIBSON ISLAND CORPORATION,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

# PAGE-PROOF BRIEF OF APPELLEE

STACIE E. TOBIN
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7400

KATHERINE WRIGHT MORRONE
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
(202) 344-4000

CRAIG D. ROSWELL
NILES BARTON AND
  WILMER LLP
111 South Calvert Street
Suite 1400
Baltimore, Maryland 21202
(410) 783-6300

*Counsel for Appellee Gibson Island Corporation*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-2295__    Caption: _Group Home on Gibson Island, LLC, et al., v Gibson Island Corporation_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Gibson Island Corporation_
(name of party/amicus)

_____

who is _____defendant-appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____  Date: 4/17/24

Counsel for: Appellee Gibson Island Corp.

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................iv

STATEMENT OF ISSUES ............................................................................1

STATEMENT OF THE CASE.........................................................................1

    A.    Gibson Island Has Deed Covenants that Apply to All Residents ..............................................................................4

    B.    Lussi Secretly Attempted to Circumvent the Deed Covenants............4

    C.    Lussi Resisted GIC's Attempt to Enforce the Deed Covenants ...........6

    D.    The District Court Rebuked Lussi's Rule-Breaking.............................9

    E.    GIC's Evaluation of Plaintiffs' Accommodation Request.................10

        1.    Architectural Committee Review and Approval ......................10

        2.    Accommodations Committee Review and Recommendations....................................................................10

    F.    Lussi Rejects GIC's March 18 Approval of an Assisted Living Facility ..................................................................................13

    G.    Lussi Rejects GIC's March 26 Approval of an Assisted Living Facility ..................................................................................17

    H.    Litigation Resumes.............................................................................21

    I.    Plaintiffs Attempt to "Resume Negotiations" During Litigation While Lussi Continued to Harass Island Residents ...........22

    J.    Any Concern with Banbury Is Purely Due to Lussi's Involvement........................................................................................23

    K.    DOJ Statement of Interest .................................................................24

    L.    The District Court Grants GIC Summary Judgment, Denies Plaintiffs' Cross-Motion for Summary Judgment, and Denies Plaintiffs' Motion to Amend the Complaint .......................................25

SUMMARY OF ARGUMENT .....................................................................26

ARGUMENT .................................................................................................27

I. Plaintiffs' FHA Claims Fail Because GIC Did Not Deny a Necessary Accommodation ................................................... 27

    A. GIC Did Not Constructively Deny an Accommodation .......... 28

        1. GIC Approved an Accommodation Twice .................... 28

        2. There Was No Unjustified Delay or Other Constructive Denial ...................................................... 30

    B. Plaintiffs Failed to Show Their Preferred Accommodation Was Necessary ............................................. 33

        1. Plaintiffs Had the Burden to Prove All Elements of Their Claim ...................................................... 34

        2. Alternatives Are to Be Considered in the Analysis ........................................................................ 34

        3. The Provisions Were the Alternative Approved by GIC .......................................................................... 37

        4. The Court Was Not Required to Assess Reasonableness ............................................................ 39

    C. The Government's Requested Change in the Law of this Circuit Should Be Rejected .................................... 40

II. Plaintiffs' Reasonable Accommodation Claim Fails Under State Law ....................................................................................... 42

III. GIC Did Not Engage in Unlawful Discrimination or Retaliation ................................................................................... 43

    A. There Is No Evidence GIC Engaged in Unlawful Discrimination Under the FHA .................................... 44

        1. There Is No Direct Evidence of Discrimination ............ 45

        2. The Community Views Argument Fails ........................ 47

    B. Plaintiffs' State Law Discrimination Claim Likewise Fails ..................................................................... 50

    C. Plaintiffs Do Not Have Standing to Bring Their Retaliation Claims, Nor Do They Have Sufficient Evidence to Sustain Those Claims ............................................. 51

CONCLUSION ....................................................................................... 56

ADDENDUM

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A Helping Hand, LLC v. Baltimore Cnty.*,
515 F.3d 356 (4th Cir. 2008) ...................................................47, 48

*Astralis Condo. Ass'n v. HUD*,
620 F.3d 62 (1st Cir. 2010)................................................................31

*Bd. of Dirs. Cameron Grove Condo., II v. State Comm'n on Human Rels.*,
63 A.3d 1064 (Md. 2013) .................................................42, 43, 50

*Bondurant v. Air Line Pilots Ass'n, Int'l*,
679 F.3d 386 (6th Cir. 2012) .........................................................46

*Bryant Woods Inn, Inc. v. Howard Cnty.*,
124 F.3d 597 (4th Cir. 1997) ...................................................*passim*

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006).........................................................................52

*Bush v. Davis*,
No. 09-cv-2002, 2009 U.S. Dist. LEXIS 74987 (D. Md. Aug. 24, 2009)..........28

*Clark v. 100 Harborview Drive Council of Unit Owners*,
No. 14-cv-3122, 2016 WL 1159198 (D. Md. Mar. 23, 2016)............................53

*Davis v. Habitat for Humanity of Bay Cnty., Inc.*,
558 Fed. App'x 850 (11th Cir. 2014) .....................................29, 32, 33

*Elderhaven, Inc. v. City of Lubbock*,
98 F.3d 175 (5th Cir. 1996) .......................................................34, 41

*Evans v. ForKids, Inc.*,
306 F. Supp. 3d 827 (E.D. Va. 2018) ..............................................31

*Gavin v. Spring Ridge Conservancy, Inc.*,
934 F. Supp. 685 (D. Md. 1995).....................................................39

*Geraci v. Union Square Condo. Ass'n*,
891 F.3d 274 (7th Cir. 2018) .........................................................52

*Gorny v. Salazar*,
413 Fed. App'x 103 (10th Cir. 2011) ........................................ 46-47

iv

*Grayson O Co. v. Agadir Int'l LLC*,
   856 F.3d 307 (4th Cir. 2017) ...................................................................*passim*

*Groome Resources, Ltd. v. Parish of Jefferson*,
   234 F.3d 192 (5th Cir. 2000) ............................................................30

*Hall v. Greystar Mgmt. Servs., L.P.*,
   28 F. Supp. 3d 490 (D. Md. 2014).......................................52, 53, 55

*Hanson-Metayer v. Rach*,
   Nos. 737 & 1657, 2018 WL 5045773 (Md. Ct. Spec. App.
   Oct. 17, 2018) ..................................................................................51

*Harmony Haus Westlake, L.L.C. v. Parkstone Prop. Owners' Ass'n*,
   851 Fed. App'x 461 (5th Cir. 2021) .......................................35, 36, 39

*Hemisphere Bldg. Co. v. Village of Richton Park*,
   171 F.3d 437 (7th Cir. 1999) .........................................................38, 39

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
   314 F.3d 657 (4th Cir. 2003), *aff'd on reh'g*, 354 F.3d 277
   (4th Cir. 2004)...................................................................................45

*Hollis v. Chestnut Bend Homeowners Ass'n*,
   760 F.3d 531 (6th Cir. 2014) ............................................................42

*Howard v. HMK Holdings, LLC*,
   988 F.3d 1185 (9th Cir. 2021) ..........................................................35

*Laing v. Fed. Express Corp.*,
   703 F.3d 713 (4th Cir. 2013) ........................................................45, 46

*Lambert v. Savaseniorcare Admin Servs., LLC*,
   No. 20-cv-2768, 2022 WL 3027993 (D. Md. July 29, 2022)............55

*Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch Plains*,
   284 F.3d 442 (3d Cir. 2002) ........................................................36, 43

*Logan v. Matveevskii*,
   57 F. Supp. 3d 234 (S.D.N.Y. 2014) .............................................32, 36, 39

*Martin v. Brondum*,
   535 Fed. App'x 242 (4th Cir. 2013) ..................................................44

*Means v. City of Dayton*,
   111 F. Supp. 2d 969 (S.D. Ohio 2000) ...........................................32, 36, 39

v

*Meraki Recovery Hous., LLC v. City of Coon Rapids*,
    No. 20-cv-0203, 2021 WL 5567898 (D. Minn. Nov. 29, 2021) .......................49

*Norman v. Borison*,
    994 A.2d 1019 (Md. Ct. Spec. App. 2010).........................................................52

*One Loving Hous., LLC v. City of Anoka*,
    93 F.4th 424 (8th Cir. 2024) ...............................................................................35

*Pate v. Tucker*,
    No. 06-cv-936, 2007 WL 9780573 (D. Md. Jan 11, 2007) ................................53

*Proa v. NRT Mid Atlantic, Inc.*,
    618 F. Supp. 2d 447 (D. Md. 2009)....................................................................45

*Romeka v. RadAmerica II, LLC*,
    301 A.3d 26 (Md. 2023) ......................................................................................50

*Ruffin Hotel Corp. of Md. v. Gasper*,
    17 A.3d 676 (Md. 2011) ......................................................................................50

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*,
    938 F.3d 1259 (11th Cir. 2019) .....................................................................39, 40

*Scoggins v. Lee's Crossing Homeowners Ass'n*,
    718 F.3d 262 (4th Cir. 2013) ..............................................................................30

*Siguel v. King Farm Citizens Assembly, Inc.*,
    No. 22-cv-672, 2023 WL 6643348 (D. Md. Oct. 12, 2023).............................35

*Singleton v. Wulff*,
    428 U.S. 106 (1976)............................................................................................37

*Sky Cable, LLC v. DIRECTV, Inc.*,
    886 F.3d 375 (4th Cir. 2018) ..............................................................................44

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993)............................................................................................51

*United States v. Buculei*,
    262 F.3d 322 (4th Cir. 2001) ..............................................................................37

*United States v. Hillhaven Corp.*,
    960 F. Supp. 259 (D. Utah 1997)........................................................................36

*United States v. Yonkers Bd. of Educ.*,
    837 F.2d 1181 (2d Cir. 1987) .........................................................................47, 48

*US Airways, Inc. v. Barnett*,
535 U.S. 391 (2002) ................................................................40, 41, 42

*Vorcheimer v. Philadelphian Owners Ass'n*,
903 F.3d 100 (3d Cir. 2018) ..............................................................35

*Williams v. Arora Hills Homeowners Ass'n*,
No. 19-cv-3370, 2021 WL 2226199 (D. Md. June 2, 2021) ............................54

*Wilson v. Dryvit Sys.*,
71 Fed. App'x 960 (4th Cir. 2003) ....................................................50

*Women's Elevated Sober Living L.L.C. v. City of Plano*,
86 F.4th 1109 (5th Cir. 2023) ............................................................35

*Xiangyuan Zhu v. Countrywide Realty Co.*,
165 F. Supp. 2d 1181 (D. Kan. 2001) ................................................54

## Statutes & Other Authorities:

42 U.S.C. § 3604(f) ................................................................44, 55

42 U.S.C. § 3604(f)(1) ............................................................21, 43

42 U.S.C. § 3604(f)(2) ............................................................21, 43

42 U.S.C. § 3604(f)(3) ..................................................................27

42 U.S.C. § 3604(f)(3)(B) ........................................................21, 29

42 U.S.C. § 3617 ..................................................................*passim*

Fed. R. App. P. 28(a)(8)(A) ............................................................45

Md. Code, State Gov't § 20-706(b)(1) ................................................43

Md. Code, State Gov't § 20-706(b)(2) ................................................43

Md. Code, State Gov't § 20-708 ................................................43, 51, 55

*State and Local Land Use Laws and Practices and the Application of the Fair Housing Act*, Joint Statement of the Dep't of HUD & DOJ 14
(Nov. 10, 2016) ..........................................................................48

## STATEMENT OF ISSUES

1.  Did the district court correctly find that GIC complied with the Fair Housing Act (FHA) and corresponding Maryland law, including regarding Plaintiffs' reasonable accommodation request?

2.  Did the district court correctly find that Plaintiffs' discrimination and retaliation claims fail as a matter of law?

## STATEMENT OF THE CASE

Appellee Gibson Island Corporation ("GIC") is the homeowners association for Gibson Island, a community in Anne Arundel County, Maryland. For years, Craig Lussi ("Lussi")—a Gibson Island resident and owner of Appellants Group Home on Gibson Island, LLC ("GHGI") and Assisted Living Well Compassionate Care 2, LLC ("ALW2") (collectively, "Plaintiffs")—has harassed and harangued the Gibson Island community. GIC, as the community representative, has taken the brunt of Lussi's ire. To Lussi, the rules and restrictions that apply to all residents do not apply to him.

In late 2019 and early 2020, Plaintiffs charged ahead with unapproved plans to establish a commercial, for-profit assisted living facility at 1753 Banbury Road ("Banbury") on Gibson Island, a small community of approximately 200 homes. These actions violated restrictive covenants ("Deed Covenants") that require all Gibson Island homeowners to obtain prior approval from GIC to use homes as

businesses and to make exterior improvements. Lussi's defiance of the Deed Covenants continued a pattern of unrestrained, confrontational behavior that previously earned him a censure from GIC.

On May 28, 2020, the district court rebuked Lussi for his rule breaking. Granting summary judgment to GIC in a consolidated case, No. 1:20-cv-842-RDB (the "Related Case"), the court declared that, if GHGI wished to establish a facility, it would first have to seek approval from GIC. The court found no evidence that GIC's attempt to enforce the Deed Covenants discriminated against GHGI based on the disabilities of Banbury's potential residents. At the same time, in the instant case, the court denied a preliminary injunction GHGI requested on its federal and state Fair Housing Act ("FHA") claims and encouraged a pause in litigation to allow GHGI to make a proposal to GIC.

Plaintiffs submitted their proposal in June 2020. GIC examined the request through an Accommodations Committee, which produced an extensive report, and then designated a Negotiations Committee to attempt to reach an agreement with Plaintiffs. From January through April 2021, GIC pursued an accommodation in earnest. Yet each of the proposals GIC made was met with refusals and rambling invective from Lussi. He repeatedly accused GIC of discrimination, "public conspiracy," and bad faith, and obsessed over irrelevant issues.

Exasperated by Lussi's "negotiation" tactics, GIC made a best and final offer on March 18, 2021, and reiterated that offer on March 26. With both offers, GIC expressly *approved* a facility at Banbury on material terms similar to those Lussi indicated he would accept. Yet each time, Lussi *refused* the approval. On April 15, after receiving the second refusal—a digressive, 49-page screed—GIC recognized the futility of further attempts to obtain Lussi's acceptance and ended the process.

Litigation resumed in June 2021. Lussi's combative, inappropriate behavior continued throughout, including attempting to interfere in GIC's insurance coverage and filing scores of baseless animal control complaints against Island residents.

After years of litigation, cross-motions for summary judgment, and supplemental briefing, on November 16, 2023, the district court granted summary judgment to GIC. The district court found that GIC did not discriminate or retaliate against GHGI, ALW2, or any prospective Banbury residents. The district court's ruling was correct and should be affirmed.

Tellingly, Plaintiffs' Brief makes no mention of Lussi's prior rule breaking and bad behavior, and instead casts Lussi as a blameless victim whom GIC and community members have targeted because he wishes to serve persons with disabilities. Abundant evidence in the district court squarely refuted that narrative, which omits the core of GIC's concerns: Lussi himself. GIC corrects the record below.

A. Gibson Island Has Deed Covenants that Apply to All Residents

Like every lot on Gibson Island, Banbury is encumbered by restrictive covenants that have run with the land for a century. ECF71-3 ("Deed Covenants"); ECF71-4 at 3. These Deed Covenants prohibit homes from being used as businesses without GIC's prior approval. ECF71-3 at 7; ECF71-4 at 3. Before Plaintiffs made their judicially-compelled request for approval to operate an assisted living facility at Banbury, *see infra*, GIC had never received or approved a request from a private homeowner to erect, maintain or use their home as a business. ECF71-4 at 3-4; ECF71-8 ¶ 8.

The Deed Covenants also prohibit exterior improvements to Island homes without prior GIC review and approval. ECF71-3 at 9; ECF71-4 at 3. Through its Architectural Review Committee ("ARC"), GIC has consistently enforced this covenant. ECF71-4 at 3; ECF71-5 (GIC Architectural Guidelines and Committee Procedures); ECF71-6 ¶¶ 6-8, 13-16, 28; ECF71-7 at Attach. A. Recognizing the validity of the covenant, Lussi previously submitted proposals to improve his private home several times, including as recently as 2016. ECF71-6 ¶¶ 22-27 & Attach. D.

B. Lussi Secretly Attempted to Circumvent the Deed Covenants

Beginning in fall 2019, Lussi made clandestine plans to buy and establish Banbury as a for-profit assisted living facility without obtaining the approvals the Deed Covenants require. He approached and reached agreement with Banbury's

4

owners, Joseph Hennessy and Gwen Franco, to purchase the property for $6 million. ECF71-4 at 6.

Lussi then pursued converting the property into an assisted living facility. He hired an architectural firm, which drew up plans, and applied to Anne Arundel County for grading and building permits in Hennessy and Franco's names, even though it was his project. ECF71-16; ECF71-17; ECF71-18; ECF71-19; ECF71-20¶19 & Attach. C; ECF71-22; ECF71-23; ECF71-24. Lussi's application identified exterior renovations that should have required ARC approval, including demolishing retaining walls and a concrete deck, removing solar panels, constructing accessible ramps with landings and parking, and repairing or replacing existing HVAC and power generator equipment. ECF71-3 at 9; ECF71-17; ECF71-19; ECF71-20¶19 & Attach. C. Lussi personally "held talks with Anne Arundel County" in pursuit of his plans. ECF71-4 at 5; ECF71-10; ECF71-21. In the same period, Lussi approached and obtained a proposal for a business loan from Sandy Spring Bank. ECF71-4 at 6; ECF71-26.

After submitting an initial building permit application and two revised applications to correct deficiencies, Lussi obtained the building permit. ECF71-23. Several days later, GHGI and the Hennessy/Francos executed a contract of sale for the $6 million price. ECF71-25; ECF71-20 at Attach. A. The sale closed on March 4, 2020. ECF71-20 at Attach. A; ECF71-26.

C.     Lussi Resisted GIC's Attempt to Enforce the Deed Covenants

Plaintiffs never applied to GIC for approval of their plans, as the Deed Covenants required. ECF71-4 at 6-7, 9-13. Instead, on March 4, 2020, they began construction of the facility, which GIC did not learn of until March 25. *Id.* at 6; ECF71-8¶9. That day, seeking compliance with the Deed Covenants, GIC demanded that Lussi cease construction. ECF71-4 at 6; ECF71-28.[1] To enforce Island rules, Gibson Island's Special Police ("GI Police") tried to prevent Lussi's construction personnel and equipment from entering onto the Island. ECF71-29¶¶2, 4. These efforts escalated when Lussi, consistent with his long pattern of aggressive conduct, *see infra*, provoked an altercation at the gatehouse and instructed contractors to go to his property in defiance of GI Police directives. *Id.* ¶6.

On March 26, then-GIC President Daly wrote to Lussi that his efforts to establish and operate a commercial assisted living facility with exterior renovations without GIC approval violated the Deed Covenants. ECF71-27; ECF71-4 at 6; ECF71-8¶11. Nevertheless, Daly indicated GIC's openness to receive and engage in dialogue around any proposal that Lussi wished to submit. ECF71-27; ECF71-4 at 6. Daly requested that Lussi produce details of his plans, assuring Lussi that GIC

---

[1] Plaintiffs acknowledge the March 25, 2020 "cease-and-desist" letter, OB10, but fail to explain that GIC sent it because Lussi was violating the Deed Covenants and had actively sought to conceal his violative activities.

would give full, fair, and prompt consideration to any proposal. ECF71-27; ECF71-4 at 6-7.

Lussi never responded and refused to submit any proposal for approval. ECF71-4 at 7; ECF71-8¶13. Instead, he continued to circumvent security directives and proceed with renovations, including the exterior improvements covered by the Deed Covenants. ECF71-8¶14 & Attach. B; ECF71-20¶17. Whenever GI Police stopped construction personnel and equipment at the gatehouse, Lussi transported them in his own vehicle or by boat. ECF71-4 at 7; ECF71-29¶¶8, 10-14; ECF71-20¶17; OB11.[2] As part of his defiance, Lussi summoned law enforcement, calling county police and twice retaining an off-duty Maryland State Police lieutenant to coerce GI Police not to enforce Island rules. ECF71-8¶15; ECF71-29¶¶5, 8-11. Along the way, Lussi lied, and instructed his contractors to lie, to GIC personnel and GI Police to advance the project. *See, e.g.*, ECF71-29¶¶10, 13-14; ECF71-4 at 7; ECF71-8 at Attach. B.

Lussi's flagrant, combative flouting of the Deed Covenants was consistent with his well-documented history of inappropriate confrontational behavior. On November 23, 2019—months before anyone knew of Lussi's plans for Banbury— GIC adopted a resolution that condemned Lussi for a series of aggressive actions

---

[2] Citations to Plaintiffs' Opening Brief appear as "OB" and to the Government's Amicus Brief as "AB."

toward seven different individuals, including several women he intimidated; cited a judge's observation that, despite filing for peace orders, Lussi was actually the one who had engaged in "harassment," often by "sticking a camera in somebody else's face"; and instructed Lussi to "refrain from such conduct in the future directed at any member of the Gibson Island community." ECF71-8¶¶17-18 & Attach. C. Lussi also was expelled from the Gibson Island Club (a separate Gibson Island-related entity) on November 26, 2019 (again, before anyone knew of his plans for Banbury), based on the same misconduct cited in GIC's November 23, 2019 resolution censuring Lussi. ECF71-8¶¶17-19 & Attach. C, D.

Plaintiffs claim in their Brief, without any citation or evidence, that Lussi's expulsion from the Club was a culmination of "acrimony over the Mountain Road development."[3] OB56. As the GIC resolution and Gibson Island Club expulsion letters show (ECF71-8 & Attach. C, D), and deposition testimony confirms (ECF88-7 at 32:21-34:12, 158:19-159:10; ECF88-3 at 113:2-17, 161:19-162:6, 288:11-289:10), that assertion is false. Rather, the Club took action to protect the safety and well-being of fellow Club members. ECF71-8¶19 & Attach. D. And, in any event, the Club is separate and independent of GIC. ECF71-46¶9.

---

[3] Lussi previously tried to establish a group home on nearby Mountain Road. Mountain Road is not part of Gibson Island and GIC has no authority over developments there.

D.     <u>The District Court Rebuked Lussi's Rule-Breaking</u>

On March 30, 2020, GIC filed an action seeking a declaration to require Lussi to request approvals consistent with the Deed Covenants and the reasonable accommodation provision of the FHA. 842ECF1.[4] Several days later, GHGI filed this action and sought a preliminary injunction. ECF1 – 2. GHGI alleged that GIC was engaging in intentional discrimination based on the disabilities of Banbury's potential residents by attempting to enforce the Deed Covenants. ECF1 – 2. The court consolidated the actions and entertained simultaneous briefing on the motion for summary judgment that GIC filed in its case and GHGI's motion for preliminary injunction in this case. 842ECF10.

On May 28, 2020, after a lengthy hearing, the district court granted GIC's motion, entered the declaratory judgment GIC requested, and denied GHGI's motion. 842ECF28 – 29; ECF71-4; ECF18. The court found that: the Banbury facility was a business under the Deed Covenants; the Deed Covenants covered the exterior renovations; and GHGI had to obtain GIC approval before recommencing construction. ECF71-4 at 9-13. Finding no evidence of discriminatory motive, *id.* at 14-18, the court rejected GHGI's claim that GIC engaged in disability discrimination by attempting to enforce the Deed Covenants and called out Lussi for flouting the rules:

---

[4] Citations to filings in the Related Case appear as "842ECF."

> *Instead of following these procedures and granting the Corporation an opportunity to provide an exception to its facially neutral rules, Group Home seeks to bypass these rules entirely and unilaterally proceed with its construction. The Fair Housing Act simply does not provide Group Home and Lussi a "blanket waiver" of facially neutral rules.*

*Id.* at 18 (emphasis added); ECF71-31 at 122 (Related Case district court stating it could not "ignore the fact that Mr. Lussi proceeded at his own peril early in the game … summarily making the decision not to seek approval from the Corporation").

E.     GIC's Evaluation of Plaintiffs' Accommodation Request

In June 2020, Plaintiffs submitted two applications to GIC—the first on June 5 for approval of exterior renovations, the second on June 10 for approval to operate an assisted living business for nine seniors at Banbury. ECF71-33; ECF71-34.

1.     *Architectural Committee Review and Approval*

On July 10, consistent with a June 22 memo explaining its findings, ECF71-35, the ARC sent Plaintiffs a letter indicating several deficiencies with their request. ECF71-37. On October 15, after Plaintiffs addressed the deficiencies, the ARC issued a memo recommending approval of the request. ECF71-44. On October 29, the GIC Board approved the request and sent Plaintiffs a letter informing them of the approval. ECF71-45.

2.     *Accommodations Committee Review and Recommendations*

On June 26, 2020, the GIC Board voted to create a three-person Accommodations Committee to evaluate Lussi's business use proposal—the first

request for a business use GIC had ever received for a private home. ECF71-4 at 3-4; ECF71-8¶8; ECF71-36; ECF71-35 at 3. On July 16, after several exchanges between the parties' attorneys, the Committee was provided access to documents under the district court's Protective Order to facilitate consideration of the proposal. ECF71-38 – 41. The parties agreed to meet on August 21 to discuss the proposal. ECF71-42.

On August 20, at Lussi's request, GIC's counsel emailed Lussi's counsel a list of discussion topics for the meeting, ECF71-43, although each side elected not to have counsel present at the meeting.[5] *Id.* A lengthy Zoom call took place the next day. ECF71-30 at Tab 5 (begins at GIC014389). In the following weeks, Lussi provided certain documents and information the Committee had requested and toured Banbury with the Committee. *Id.* at Tab 1 (begins at GIC014345), Tab 2 (begins at GIC014376), Tab 8 (begins at GIC013460), Tab 9 (begins at GIC014643) & Tab 10 (begins at GIC013482).

On December 11, upon resolution of the parties' disagreements on Board access to documents designated as confidential under the district court's Protective

---

[5] Plaintiffs claim that "the Corporation asked to deal directly with the Lussis, without counsel." OB18. The contemporaneous evidence on this point belies that statement. *See* ECF71-43 (Plaintiffs' counsel stating on August 20, 2020: "At this point, we do NOT plan to have any lawyers attend the zoom meeting for our side. Accordingly, we'll operate on the understanding that no attorneys from either side will attend the meeting.").

Order, ECF30–34, the Committee submitted a detailed, 30-page report (the "Report") to the Board. ECF71-30. The Committee concluded that "the operation of a Lussi-operated assisted living facility as a business on Gibson Island will impose major administrative and financial burdens on the Corporation," because "based on Mr. Lussi's history of contentious, rule-breaking behavior and the vague, inconsistent or unverifiable representations the Lussis have made related to the Request, we believe that entering an accommodation agreement with the Lussis will lead to frequent, time-consuming, and potentially expensive disputes initiated by Mr. Lussi, potentially including additional litigation." *Id.* at 26. The Report thus included recommendations to "limit the administrative and financial burdens to the Corporation, protect the residential character of the Island, and diminish any impact on the Island's environment and infrastructure." *Id.* at 27-30.

Over the next several weeks, GIC's Board met three times to discuss the Report. ECF71-46¶2. On January 5, 2021, the Board adopted a resolution that authorized negotiations with Lussi and established a three-person Negotiations Committee. ECF71-47. The resolution recounted Mr. Lussi's contentious history, as well as the findings of the Accommodations Committee, but concluded that GIC was "willing to further engage in the 'interactive process' by exploring the possibility of entering into a negotiated accommodation agreement that would incorporate the recommendations" in the Report. *Id.*

F.    Lussi Rejects GIC's March 18 Approval of an Assisted Living
      Facility

The Negotiations Committee got to work promptly. The Committee and the

Lussis exchanged emails to set a date for a meeting, identifying the Report's

recommendations as a springboard for discussion. ECF71-49; ECF71-50. The

Committee and the Lussis met for several hours on January 19, 2021. ECF71-52.

The Lussis followed up with an email the next day. *Id.* On January 24, Lussi[6] sent

another email. Foreshadowing the blizzard of bullying, digressive communications

to come, this email aggressively accused GIC of discrimination and charged a

Committee member with endorsing statements that Lussi said violated the FHA (but

in fact did not). ECF71-53.

The next day, the Committee sent the Lussis a draft Memorandum of

Understanding ("MOU") containing the proposed, material terms of an

accommodation agreement. The terms largely reflected the recommendations in the

Report. ECF71-55.

Eight days later, on February 2, rather than responding to the Committee,

Lussi sent a lengthy, scathing email directly to GIC President Cecala. ECF71-56. He

attached a clean, signed .pdf (not a Word document) of a final accommodation

---

[6] Although this and other emails referenced here were signed by Lussi, his wife
Jeannette, and their three adult children, deposition testimony established that Lussi
alone wrote the emails. ECF71-54 at 211:17-214:2.

agreement, which ignored the Committee's request to show the changes being made to its proposed MOU. *Id.* In his email, Lussi alleged that every term of the proposed MOU was discriminatory (though agreeing in substance with most of them); re-litigated matters the Related Case had already decided about his violation of the Deed Covenants; wrongly maintained he had a personal lifetime exemption from seeking approval from the ARC for exterior renovations; explained why Banbury would only follow "lawful" GIC rules—effectively arrogating to himself the authority to determine which rules to follow; repeated his allegations of GIC's purported history of disability discrimination and "public conspiracy" against him; and accused GIC of considering the Banbury proposal in bad faith. *Id.*

Cecala sent Lussi's package to the Negotiations Committee, which, despite Lussi's combative tone, sent a measured response on February 9. ECF71-57. Attaching a revised MOU, the Committee explained that it was accepting several of Lussi's proposed changes, indicated which changes it could not accept, identified areas for further discussion, and implored Lussi to engage in a conventional negotiation by focusing on the terms of an agreement, eliminating irrelevant issues and baseless allegations, and sending back a Word version of any counterproposal showing changes. *Id.*

This initial exchange set a pattern for the next six weeks. GIC would send a proposal, explaining the changes it was accepting and those it could not, and Lussi

would respond with long, unfocused diatribes. Lussi sought to bully GIC into acquiescence with heated accusations of misconduct, and obsessed over irrelevancies, particularly the 1991 "Carson Settlement," which provides fee-based access to the Gibson Island Club to GIC shareholders who do not join the Club.[7] This pattern repeated itself numerous times. Between January 25 and March 9, he sent seven emails, comprising approximately 100 pages of vitriol. ECF71-51, 55 – 67.

Amid these exchanges, the Negotiations Committee proposed, and Lussi agreed to, a meeting on February 18 to discuss the parties' differences. ECF71-57; ECF71-61. The afternoon before the meeting Lussi sent the Committee another diatribe, attaching a 29-page questionnaire seeking written justification for each provision of the proposed MOU as a pre-condition to the meeting. *Id.* ("[The proposed meeting time] works for a recorded Zoom call … subject to the GIC answering the question(s) below and on the attached form.").

The Committee responded the same day, emphasizing that:

> [T]he purpose of our ongoing discussions with you is not to score points and win arguments, but rather to try to *move past* our disagreements, to resolve the issues that separate us, and to avoid further litigation. We remain willing to do so—to relent on our firm position on administrative and financial burdens and to engage in substantive,

---

[7] Lussi has obsessed over the Carson Settlement despite it not having any relevance to the FHA issues in this case. ECF71-46¶15. Indeed, even in their Appellant Brief, Plaintiffs continue to include irrelevant references to the Carson Settlement. *See* OB4-5.

meaningful discussions to resolve our differences with you. We obviously cannot force you to do the same. We can only ask. So we ask: if you are genuinely interested in opening a group home at 1753 Banbury, please stop trying to unilaterally dictate the terms of an agreement to us and settle old scores; instead, please engage in a respectful, non-accusatory dialog over the issues that separate us.

ECF71-62. The Committee's entreaty was unavailing. After the meeting, the pattern of a Committee offer, followed by a sprawling, incendiary reply, continued for the next three weeks. *See supra*.

On March 18, exasperated that Lussi's tactics had "negotiations … moving backwards not forward to completion of an MOU," GIC President Cecala sent the Lussis a best and final offer on behalf of the full Board. ECF71-68. In the transmittal email, Cecala expressly approved the establishment of an assisted living facility at Banbury: "the Board has decided that it will <u>approve</u> your proposed business use of 1753 Banbury upon your acceptance of the attached MOU." *Id.* Cecala also identified the few remaining material points of disagreement, which the MOU resolved. *Id.* Cecala concluded: "Upon your execution of the attached MOU without further revision, we will instruct our counsel to work with your counsel to draft an Accommodation Agreement." *Id.* Cecala refused to permit further revision because the parties had been negotiating for months and Lussi had continuously demonstrated a willingness to obsess over irrelevancies and accusations.

On March 20, rather than accepting GIC's approval, Lussi rejected it and reverted to form. ECF71-69. He responded with a tirade, rehashing the same

grievances, recycling the points about the irrelevant Carson Settlement, and introducing a new irrelevant subject: the proposed revisions to the Deed Covenants that GIC was separately considering and that Lussi opposed. *Id*.; ECF71-46¶¶17-18. Lussi's response included another MOU that was layered with references to the Carson Settlement and the proposed Deed Covenants revisions and reflected no compromise on the material points of disagreement. ECF71-69 (begins at GHGI-ALW003707).

G.    <u>Lussi Rejects GIC's March 26 Approval of an Assisted Living Facility</u>

On March 26, GIC tried again. Cecala sent Lussi an email that GIC was approving the facility based on the MOU sent on March 18 and would not accept additional changes. ECF71-70. After again explaining why the Carson Settlement and proposed Deed Covenants revisions were not germane, Cecala noted why each of the few disputed provisions Plaintiffs kept changing were vital to protecting GIC's interests. These four provisions (hereinafter the "Provisions") were as follows:

- **The Guarantor Provision**, which required guarantees from those associated with Banbury and its operators. (Plaintiffs had initially agreed to include these entities and individuals until reneging.) GIC needed this provision given Lussi's history of rule-breaking—"to guard against the situation in which an individual breaches or circumvents the agreement but is effectively unaccountable because they are without means and not all of the related entities or individuals have guaranteed the remedies for their non-compliance."

- **The Septic Provisions (which include the Food Service Provision and Environmental Protection Provision)**. The Food Service Provision required the group home <u>operator</u> to (1) obtain a one-time certification from a competent hydrological engineering firm as to the adequacy of the septic system to accommodate the full residency and staffing of the facility[8]; (2) provide a plan to monitor and evaluate current and future impacts of discharges from the property; and (3) should there be a problem, bear the costs of any necessary remediation. The Environmental Protection Provision required the <u>operator</u> to (1) provide an annual septic capacity certification,[9] and, if the system was not working properly or out of compliance with relevant law, take measures to ensure compliance; (2) install a flow meter that would create daily reports of the flow level, and maintain those reports for inspection by GIC upon request; and (3) if the reports show excessive flow for three consecutive days, return the rate to compliance. The provisions were important because of the environmental sensitivity of Gibson Island, a land covenant providing that Banbury's owner may not expand the occupancy capacity of the residence beyond the criteria in the covenant (e.g., five bedrooms), *see* ECF71-71, and the proposed increase in occupancy to nine full-time residents (and bedrooms) and one to three staff around the clock.

- **The Dispute Resolution Provision**, which, in order to resolve disputes promptly, had a notice-and-cure period of less than the 60 days Lussi had demanded.

---

[8] This one-time certification goes to the adequacy of the septic system at a point in time before the operator begins food service at the facility because the septic system does not just handle toilet waste; it also handles kitchen waste, as well as wastewater from laundry, showers, and sinks, and any other wastewater generated on a property. *See, e.g.*, ECF107-2 (EPA's "About Septic Systems").

[9] This annual certification was required as recognition of the ongoing maintenance and functioning of the septic system, to prevent environmental pollution and to prevent sewage from backing up in the home. *See* ECF107-3 (EPA's "How to Care for Your Septic System"). Plaintiffs are bound by federal, state, and local regulations relating to septic. ECF104 at 18. The EPA recommends that alternative systems, like Banbury's, be inspected annually. ECF107-3.

- **The Arbitration Escrow Provision**, which required each party to put $100,000 in escrow prior to any arbitration. The provision was necessary to ensure the winning party would be made whole and to disincentivize both sides from ginning up disputes and racing to expensive arbitration—a serious concern for GIC given Lussi's history.

ECF71-70; *see also* ECF47¶1 (Plaintiffs' confirmation that "only four substantive restrictions remained under discussion"); ECF107. Cecala ended the email by repeating that GIC "will approve your proposed business use of 1753 Banbury Road, subject to the execution of a final Accommodations Agreement, if you sign this proposed MOU *without alteration*." ECF71-70.

The Guarantor, Dispute Resolution, and Arbitration Escrow Provisions were designed to deter Lussi from embroiling GIC in meritless but costly disputes. ECF71-32 at 141:11-144:22.

The Septic Provisions were necessary given the environmental sensitivity of Gibson Island and Plaintiffs' plan to increase the occupancy of Banbury. ECF71-70. These concerns were particularly acute given that the prior owners of the Banbury property had obtained a variance to install a septic system that did not comply with the governing county regulations, in an area that also did not comply. ECF71-71. The terms of the variance were conditional and subject to a recorded covenant that prohibits "any renovations or remodeling which enlarges the living space or occupancy capacity of the residence beyond the criteria outlined within this approval," and prohibits more than five bedrooms (the "Variance"). *Id.* ¶¶8, 11(c).

Nevertheless, Plaintiffs sought to increase the number of bedrooms from four to nine and the number of bathrooms from five to nine. *See* ECF71-17 at 3; ECF71-30 at 12. Plaintiffs did not secure a written amendment to the Variance before making changes that violate it, despite its express language that such a writing is needed for any modification. ECF71-71 at 3-4.

GIC was specifically concerned that the increased occupancy could result in septic overflows that would run downhill from Banbury straight into the Chesapeake Bay. ECF107-9 at 107:5-108:17. The nonconventional septic system is located in an area deemed a "Critical Area" by state law and which is encircled by flood zones. ECF71-17 at 3, ECF71-18 at 3; ECF107-6 at GHGI-ALW010024; ECF107-7 at GHGI-ALW008792; ECF107-8 at 227:10-17.[10]

Lussi's response to the March 26 approval was even more vitriolic than his March 20 response. ECF71-72. In a large package sent to GIC on April 5, Lussi rejected the approval and delivered a rambling, 49-page, single-spaced screed that incorrectly accused GIC of serial misconduct, largely on matters that had nothing to do with Banbury. *Id.* (begins at GHGI-ALW005932).

On April 15, recognizing the futility of further attempts to obtain the Lussis' agreement, GIC's Board passed a resolution ending discussions. ECF71-73; ECF71-

---

[10] The Septic Provisions were further necessitated by Lussi's refusal during the interactive process to undertake any evaluations or independent monitoring of the septic system. ECF71-30 at 20, 195-96.

32 at 239:6-20. The resolution explained that Lussi had twice rejected GIC's approval of Banbury; that Lussi's "history of contentiousness, rule-breaking and untrustworthiness … demonstrate that the Lussi family's operation of [Banbury] will impose undue administrative and financial burdens on the Corporation"; and that "the positions and actions taken by the Lussi family during the course of negotiations regarding an MOU … reinforce [this] conclusion." ECF71-73. The next day, Cecala sent the Lussis an email attaching the resolution. ECF71-74. The email summarized the resolution and stated that, without the provisions in GIC's MOU, "you would never stop spoiling for a fight, and the Corporation would have inadequate means to recoup the costs it would be required to incur." *Id.*

## H.   Litigation Resumes

On June 30, 2021, Plaintiffs filed their Amended Complaint. ECF47. It included two causes of action. One alleged the violation of four provisions of the FHA regarding GIC's actions on Banbury: denying or making housing available because of disability (42 U.S.C. §3604(f)(1)); discriminating based on disability in the terms, conditions, or privileges of the sale or rental of housing, or in the provision of facilities or services of housing (42 U.S.C. §3604(f)(2)); refusing to make a reasonable accommodation necessary to afford individuals with disabilities equal housing opportunity (42 U.S.C. §3604(f)(3)(B)); and retaliating against the Lussis because they asserted rights to provide housing to individuals with disabilities (42

U.S.C. §3617). *Id.* The second count alleged the same violations under Maryland's fair housing law. *Id*.

I. <u>Plaintiffs Attempt to "Resume Negotiations" During Litigation While Lussi Continued to Harass Island Residents</u>

In March 2022, nine months after filing their Amended Complaint, Plaintiffs sent GIC a revised MOU. OB25. Although GIC previously had told Lussi that it would not agree to change certain terms in the original MOU, Lussi's new proposal changed those terms anyway. ECF64-3. GIC did not substantively respond to the March 2022 settlement proposal, nor was it required to.

Nor was there any reason to believe that Lussi was genuine in his attempt to resolve any disputes. At the same time Lussi was trying to coerce GIC to settle this litigation on his terms, Lussi was continuing to harass Gibson Island residents. For example, despite being chastised by a judge in 2019 for "sticking a camera in somebody else's face," Lussi's continuing harassment-by-video of Island residents prompted cease and desist requests from GIC President Cecala, ECF88-16 (July 14, 2022 Letter); ECF88-17 (Aug. 17, 2022 Email), and messages advising residents to avoid conflict and disengage when provoked. ECF88-10. In addition, over a period of five weeks, Lussi filed approximately thirty Animal Control complaints against eighteen Island residents for having dogs off leash—many of which were in dog parks where leashes were not required. ECF88-23; ECF88-24. This conduct was in accord with Lussi's long history of harassing others besides Gibson Island residents,

22

as an Anne Arundel County judge found, including verbal harassment, inappropriate public outbursts directed towards Club staff, and improper use of judicial proceedings filed against Club members and a Club employee. ECF71-8¶¶17-19.

He also attempted to interfere with GIC's insurance coverage. In a flurry of emails and phone calls with GIC's insurer, Philadelphia, between late January and late March 2022, Lussi attempted to "make [Philadelphia] aware" of dozens of alleged, "potential" GIC liabilities, including many purportedly arising from Plaintiffs' discrimination claims in this case; to persuade Philadelphia to "get involved"; and to ask Philadelphia to evaluate whether its coverage of GIC was appropriate at all. *See* ECF88-26 – 34. On March 29, 2022, Philadelphia's counsel wrote to Lussi: "The multiple breaches of duty and/or law you enumerated and alleged against GIC … are misplaced and misguided. Post issue disclosures of this nature impact only future premium or application for renewal, which I would hope you are not attempting to interfere with." ECF88-34.

J.     Any Concern with Banbury Is Purely Due to Lussi's Involvement

The parties engaged in discovery for over a year, including nearly thirty depositions. Yet nowhere did Plaintiffs identify any evidence of discrimination or retaliation. *See infra*. Instead, what the evidence overwhelmingly shows is that GIC has clearly expressed its view that Lussi is a combative, untrustworthy rule-breaker.

ECF71-27, -30, -73. Extensive deposition testimony confirms that GIC and other Island residents hold this concern. For example:

- "To be crystal clear, the problems Mr. Lussi is encountering with his plans to develop an assisted living facility have nothing to do with the island's resistance to having an assisted living facility on the island, it's having Mr. Lussi operate a facility on the island … The problem is Mr. Lussi and his behavior. … He can't even conduct himself in being a responsible resident on the island. You have 199 people on the island who fear or hate Mr. Lussi." ECF88-7 at 280:11-281:9.

- "Continuing to regularly harass residents and the Gibson Island Corporation by either filming them, following them at two miles an hour in his car, following them home, just abhorrent behavior by any resident on the island." *Id.* at 287:4-11.

- "[Any] groundswell against the group home … [is] specifically because [of] Mr. Lussi's involvement … because of the type of person. It's all about him, his conduct." ECF88-3 at 59:12-60:3.

- "[P]eople know Mr. Lussi's reputation for all the things I have already said about [being] litigious, confrontational and, you know, so on." *Id.* at 223:17-224:1.

*See also* ECF88-7 at 212:20-21, 275:3-13, 275:22-276:16; ECF88-3 at 53:19-54:3, 71:6-12, 266:20-267:2, 346:9-22.

K.     DOJ Statement of Interest

The Parties briefed cross-motions for summary judgment in the second-half of 2022. In the midst of that briefing, the Department of Justice filed a Statement of Interest to express its views on certain aspects of the law regarding a reasonable accommodation. ECF94 ("SOI"). The SOI did not address any other claims or

arguments. SOI at 1. Both GIC and Plaintiffs filed responses to the SOI in the district court, addressing the arguments raised by the Goverment. ECF95, 97.

L.   The District Court Grants GIC Summary Judgment, Denies Plaintiffs' Cross-Motion for Summary Judgment, and Denies Plaintiffs' Motion to Amend the Complaint

On November 16, 2023, the district court issued a Memorandum Opinion, granting in full GIC's motion for summary judgment, denying in full Plaintiffs' cross-motion for summary judgment, and denying Plaintiffs' motion to amend its complaint for a second time. ECF110. In granting summary judgment for GIC, the district court found that "the undisputed material facts in this case" made clear that Plaintiffs could not prevail on their (1) refusal to make reasonable accommodations claim under §3604(f)(3)(B) of the FHA and Maryland state analogue; (2) claims that GIC discriminated against them by making unavailable or denying housing under §3604(f)(1) or (2) of the FHA and Maryland state analogue; or (3) retaliation claims. *Id.* at 17-27. In denying Plaintiffs' motion to amend the complaint, the district court specifically rejected Plaintiffs' attempt to "add new factual allegations regarding their March 2022 request for a reasonable accommodation" (regarding 430 Magothy Road). *Id.* at 28. Plaintiffs did not challenge the district court's denial of their motion to amend the complaint. OB30n.3.

This appeal followed. The Department of Justice and the U.S. Department of Housing and Urban Development (collectively, the "Government") filed an Amicus

Brief in this Court, arguing the district court erred in its analysis of the reasonable accommodation claim. *See* AB.

## SUMMARY OF ARGUMENT

This Court should affirm the judgment below because Plaintiffs cannot prove that GIC constructively denied an accommodation from the business restriction in the Deed Covenants. After engaging in an extensive interactive process in good faith, GIC twice approved an accommodation that would have allowed Plaintiffs to operate an assisted living facility on Gibson Island. Plaintiffs—through their principal, Lussi—continued a longstanding pattern of baselessly accusing GIC and Gibson Island residents of discrimination, flouting the Deed Covenants and GIC rules, and demanding an accommodation only on Lussi's terms. Because Plaintiffs cannot show that GIC constructively denied a reasonable accommodation, their claims fail, and the remainder of their arguments are of no moment.

Alternatively, this Court should affirm the judgment because Plaintiffs cannot show the particular accommodation they demanded was necessary to afford equal opportunity to persons with disabilities to reside on Gibson Island. GIC offered such an accommodation. The fact that Lussi preferred an accommodation that did not give GIC certain protections consistent with the business restriction does not render Lussi's preference necessary. The district court correctly analyzed the alternatives available in determining that Lussi's proposal was not necessary. While the

Government advocates for a change in law in this Circuit, nothing in this case or the district court's decision warrants such a radical step.

Finally, Plaintiffs' claims for discrimination and retaliation fail, whether analyzed under federal or state law. To prove discrimination, Plaintiffs must show direct evidence of discriminatory intent by decision-makers, or they must prove discrimination through the *McDonnell Douglas* framework. They make no argument as to *McDonnell Douglas* and thus have waived that approach. With respect to direct evidence, the scarce evidence on which they rely is not direct evidence of discriminatory intent by a decision-maker and is legally insufficient to survive summary judgment. With respect to retaliation, Plaintiffs' claim fails because they lack standing—as the retaliation they allege involved Lussi individually, a non-party—and they failed to provide evidence of a qualifying "adverse action." The district court correctly rejected those claims, and this Court should affirm.

## ARGUMENT

### I. Plaintiffs' FHA Claims Fail Because GIC Did Not Deny a Necessary Accommodation.

The FHA requires an accommodation for persons with handicaps if the accommodation is reasonable and necessary to afford handicapped persons equal opportunity to use and enjoy housing. 42 U.S.C. §3604(f)(3). To prevail on a §3604(f)(3) claim, a plaintiff must prove that defendant (1) refused to provide an

accommodation; (2) the accommodation was reasonable; and (3) the accommodation was necessary to afford handicapped persons equal opportunity to use and enjoy housing. *Bryant Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d 597, 603-04 (4th Cir. 1997); *Bush v. Davis*, No. 09-cv-2002, 2009 U.S. Dist. LEXIS 74987, at *2 (D. Md. Aug. 24, 2009). Plaintiffs had the burden to prove each of these requirements. *Bryant*, 124 F.3d at 603-04. Plaintiffs failed below, and fail here, to meet the first and third elements of their burden as a matter of law.[11]

A.     GIC Did Not Constructively Deny an Accommodation.

1.     *GIC Approved an Accommodation Twice.*

In this case, GIC did not refuse an accommodation. On March 18, 2021, GIC informed Lussi that "the Board has decided that it will approve your proposed business use of 1753 Banbury upon your acceptance of the terms of the attached MOU." ECF71-68. After three months of negotiations in which Lussi repeatedly denigrated GIC and engaged in bizarre, counterproductive tactics like demanding that GIC answer a questionnaire ham-handedly crafted for litigation, this was GIC's best and final offer. Rather than accepting the offer, Lussi responded with a revised

---

[11] GIC did not move for summary judgment on the reasonableness element, but vigorously maintains that had the case progressed to trial, Plaintiffs would not have been able to establish that their request was "reasonable," i.e., that it would not have imposed an undue financial or administrative burden on GIC for many of the reasons identified herein.

MOU, a continued focus on irrelevancies raised before, and repeated, false accusations of misconduct and discrimination. ECF71-69.

On March 26, GIC tried again, sending Lussi an email making clear that GIC was approving the facility based on the MOU sent on March 18. ECF71-70. Cecala explained why each of the disputed Provisions resolved by the approved MOU was vital to protecting GIC's interests. *Id.* On April 5, Lussi refused to accept and delivered a 49-page rant that "[made] clear that [he had] no interest in a mutually agreeable resolution." ECF71-72.

By approving Banbury and providing its potential residents the opportunity to live there, GIC complied with its obligations under §3604(f)(3)(B). Plaintiffs objected to the four Provisions and preferred an accommodation without them, but approving an accommodation without every feature a plaintiff demands is not a refusal. "A plaintiff is not entitled to the accommodation of his or her choice, but is entitled only to a reasonable accommodation." *Davis v. Habitat for Humanity of Bay Cnty., Inc.*, 558 Fed. App'x 850, 852 (11th Cir. 2014) (citation omitted). The accommodation approved by GIC would have allowed Plaintiffs to open a group home in the location of their choice, but Lussi—not GIC—refused that accommodation.

### 2. There Was No Unjustified Delay or Other Constructive Denial.

Implicitly acknowledging that GIC approved an accommodation, Plaintiffs argue only that GIC constructively denied the accommodation by "delaying its response, imposing conditions that deny equal housing opportunity, cutting off the interactive process when the Lussi LLCs would not accept those conditions, and then refusing to resume negotiations." OB40. Their argument is unsupported, and indeed contradicted by case law.

A defendant constructively denies an accommodation request when its unjustified and indeterminate delay has the same effect of undermining the FHA's anti-discriminatory purpose as a formal denial. *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013) (citing *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199-200 (5th Cir. 2000)). Thus, in *Scoggins*, this Court concluded the plaintiffs' request for an accommodation was constructively denied where the defendant twice "tabled" the request "pending a decision to seek additional information from the plaintiffs, but the board did not ask the plaintiffs to provide such information until more than 15 months later." *Id.* Likewise, in *Groome*, the court found a constructive denial where, months after a request had been submitted, the defendant "could not provide any timetable or plan for acting on the application." 234 F.3d at 199-200.

Here, the facts are in stark contrast. Lussi made his judicially-compelled accommodation request in June 2020. ECF71-34. In December 2020—after seven months of good faith engagement by the Accommodations Committee—that committee issued a 30+ page Report. ECF71-30. Despite the Accommodations Committee's reservations about entering into an agreement with Lussi, the Board created a Negotiations Committee that got to work immediately and negotiated in earnest (at least on their side) from January to March 2021, approving an accommodation. ECF71-47; ECF71-68; ECF71-70. GIC did not engage in a 15-month or indeterminate delay; rather, it conducted an investigation and deliberative process in response to the first-ever request for an accommodation by a resident with a history of conflict and disregard for rules. *See, e.g.*, *Evans v. ForKids, Inc.*, 306 F. Supp. 3d 827, 841-42 (E.D. Va. 2018) (conducting a legitimate investigation does not constitute a delay for constructive denial analysis).

Second, Plaintiffs and the Government argue that an accommodation with unwanted provisions is a constructive denial. Neither cites a single case supporting this position. *See* OB40-46; AB28-30. Tellingly, the one case the Government cites—*Astralis Condo. Ass'n v. HUD*, 620 F.3d 62, 69 (1st Cir. 2010)—is not supportive; it involved a condominium association's failure to grant disabled residents two permanent parking spaces close to their unit. There was no approval, with conditions or otherwise.

In contrast, courts have on numerous occasions confirmed approvals with conditions or unwanted provisions. *See, e.g.*, *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 263-73 (S.D.N.Y. 2014) (rejecting constructive denial because defendant approved an accommodation, albeit in a different apartment building than plaintiff wanted); *Means v. City of Dayton*, 111 F. Supp. 2d 969, 978 (S.D. Ohio 2000) (approval if plaintiff provided off-street parking was not a denial, even though the provision caused her to incur additional expenses). The inclusion of terms that Lussi did not prefer is not a constructive denial. *Davis*, 558 Fed. App'x at 852 (noting that plaintiff is entitled to a reasonable accommodation, not "to the accommodation of his or her choice").

Third, Plaintiffs provide no legal support for their argument that GIC's refusal to continue indefinitely with a failed interactive process (or restart mid-litigation) is a constructive denial. OB40-46. This litigation began because Lussi refused to first request an accommodation, and GIC had to obtain a court order requiring him to do so. ECF71-4. GIC then engaged with Lussi for months, enduring his frequent verbal attacks, irrational demands, and hostile behavior. *E.g.*, ECF71-53; ECF71-56; ECF71-61; ECF71-69; ECF71-72. When that process resulted in a stalemate, GIC ended negotiations (ECF71-73) and relied on the district court to resolve the

dispute.[12] Accepting Plaintiffs' position would enable an accommodation seeker to stretch out the interactive process indefinitely, even during pending litigation, until they get the specific accommodation they demand, in contravention of the well-established principle that an individual "is not entitled to the accommodation of his or her choice but it entitled only to a reasonable accommodation." *Davis*, 558 Fed. App'x at 852; *cf. Bryant*, 124 F.3d at 603 ("And the FHA does not … give the disabled carte blanche to determine where and how they would live regardless of zoning ordinances to the contrary.").

Given that Plaintiffs have failed to show constructive denial, their claim fails at the first element. *Bryant*, 124 F.3d at 603-04. This Court should reject Plaintiffs' reasonable accommodation appeal on this basis alone.

B. Plaintiffs Failed to Show Their Preferred Accommodation Was Necessary.

Plaintiffs' Brief does not make clear what error they believe compromised the district court's decision, but they appear to contend the court was required to

---

[12] Plaintiffs also focus on a purported accommodation request from March 2022, OB25-27, 49-50, 62, but any purported claims related to the 2022 request are not before this Court. The March 2022 Request was alleged only in the proposed second amended complaint. The district court, however, denied Plaintiffs' request to amend the complaint, including their attempt to add allegations relating to the 2022 request. ECF110 at 28-29. Plaintiffs have stated that they are not appealing the denial of the motion for leave to amend, OB30n.3, and thus the March 2022 request is not before this Court. Likewise, any discussion of Dr. Varn and the role he could play, *see* OB25-27, 44-45, 49-50, are part of the 2022 request and not before this Court.

determine first whether plaintiff's proposed accommodation was reasonable before considering defendant's counterproposals. OB34-35. The law of this Circuit, however, burdens a plaintiff to show the defendant refused to make an accommodation that was necessary to provide the disabled an equal opportunity to enjoy housing, and it permits the court to consider alternatives to plaintiffs' proposed accommodation. The district court correctly found that Plaintiffs failed to meet their burden.

### 1. Plaintiffs Had the Burden to Prove All Elements of Their Claim.

In *Bryant*, this Court plainly stated: "Because the FHA's text evidences no intent to alter normal burdens, the plaintiff bears the burden of proving each of these three elements by a preponderance of the evidence." 124 F.3d at 603-04 (citing with approval *Elderhaven, Inc. v. City of Lubbock*, 98 F.3d 175, 178 (5th Cir. 1996)). Thus, Plaintiffs were obligated to offer sufficient evidence that GIC had refused an accommodation that was necessary to afford handicapped persons equal opportunity to use and enjoy housing.

### 2. Alternatives Are to Be Considered in the Analysis.

Plaintiffs argue that because there is no group home in the small Gibson Island community, their proposed accommodation is necessary. OB30. This oversimplifies the law.

"The 'necessary' element … requires the demonstration of a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person. This requirement has attributes of a causation requirement. And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be necessary.'" *Bryant*, 124 F.3d at 604; *see also Vorcheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 110 (3d Cir. 2018); *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1190-91 (9th Cir. 2021).

To determine whether a proposed accommodation is necessary, a court must consider alternatives to the plaintiff's proposal. *Vorchheimer*, 903 F.3d at 108 ("Gauging necessity, then, requires considering whether another alternative on[sic] offer satisfies the goal of equal housing opportunity for that tenant."), 103 ("[I]f [a disabled tenant's] landlord offers her an alternative [to her request] that likewise satisfied the need, she has no right to demand the particular accommodation that she wants."). "Merely being preferable to an alternative is not sufficient; it must be essential." *Harmony Haus Westlake, L.L.C. v. Parkstone Prop. Owners' Ass'n*, 851 Fed. App'x 461, 465 (5th Cir. 2021) (citing *Bryant*, 124 F.3d at 605)); *see also One Loving Hous., LLC v. City of Anoka*, 93 F.4th 424 (8th Cir. 2024); *Women's Elevated Sober Living L.L.C. v. City of Plano*, 86 F.4th 1109, 1113-14 (5th Cir. 2023); *Siguel v. King Farm Citizens Assembly, Inc.*, No. 22-cv-672, 2023 WL 6643348, at *35 (D. Md. Oct. 12, 2023).

Numerous courts have found that a plaintiff cannot satisfy the "necessary" element when a defendant approves an accommodation, but on different terms than the plaintiff demanded, if the plaintiff's terms would not provide essential therapeutic benefits beyond what the defendant approves. In *Bryant*, for example, this Court held that a group home operator failed to show that increasing the occupancy of his home from eight authorized residents to 15 was "necessary" because he "presented no evidence … that expansion from 8 to 15 residents would be therapeutically meaningful." 124 F.3d at 605; *see also Harmony Haus*, 851 Fed. App'x at 466 (plaintiff failed to show that allowing 12 people to occupy a sober-living home, rather than the six allowed, was necessary); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch Plains*, 284 F.3d 442, 459–61 (3d Cir. 2002) (plaintiff did not show, as required, that the size of the proposed facility "is required to make it financially viable or medically effective"); *Logan*, 57 F. Supp. 3d at 263 (rejecting constructive denial argument because defendant approved an accommodation, albeit in a different apartment building than plaintiff wanted); *Means*, 111 F. Supp. 2d at 978 (approval of accommodation if plaintiff provided off-street parking was not a denial, even though the provision caused additional expenses); *United States v. Hillhaven Corp.*, 960 F. Supp. 259, 264 (D. Utah 1997) (permitting use of motorized cart but not in all areas of the building).

### 3. *The Provisions Were the Alternative Approved by GIC.*

Here, the material points of disagreement between Plaintiffs and GIC were the four Provisions, which the district court properly considered.[13] ECF71-70; ECF47¶1. The district court correctly found that Plaintiffs failed to produce evidence that any of these Provisions denied Banbury's potential residents an equal opportunity to use and enjoy Banbury or diminished the benefits the facility would have provided them. ECF110 at 18-23. In addition, it found that Plaintiffs provided only unsupported speculation about the effect of the Provisions on Banbury's financial viability. *Id.* at 21. Plaintiffs offer the conclusory argument that "prices reflect costs, and unnecessary cost increases will affect prices," but even that generalization is contradicted by Lussi's brag that his family can operate Banbury as a "passion," without profit, because "we can afford to do that." ECF 71-30 at Tab 5 (GIC014646-65).

GIC would have insisted on the Provisions if Lussi were proposing a group home for anyone, disabled or not. The Guarantor, Dispute Resolution, and Arbitration Escrow Provisions were designed to deter Lussi from embroiling GIC's

---

[13] Plaintiffs have not argued, and thus waived, that GIC's alternative accommodation is properly analyzed under the "reasonableness" element. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (finding waiver). Though the Government has so argued, an abandoned argument cannot be revived by amicus curiae. *See, e.g.*, *United States v. Buculei*, 262 F.3d 322, 333 n.11 (4th Cir. 2001) (quoting and citing *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)).

small community of 200 homeowners in meritless disputes that would require GIC to spend hundreds of thousands of dollars—again, to get him to comply with his obligations. *Supra* at 17-19. The Septic Provisions were necessitated by the environmental sensitivity of Gibson Island and Plaintiffs' plan to significantly increase the occupancy of Banbury (including beyond what was permitted in a recorded Variance). *Supra* at 18-20. None of them had anything to do with the disabilities of Banbury's potential residents, and as such, they were not discriminatory. *Hemisphere Bldg. Co. v. Village of Richton Park*, 171 F.3d 437, 440-41 (7th Cir. 1999) (disapproving cases that a city must waive the requirement that sprinklers be installed because they would increase the cost of housing to the handicapped, as for everyone). An accommodation without them simply was not necessary. To eliminate these Provisions because the residents were disabled would not give equal opportunity to disabled persons; it would allow Lussi to go unrestrained just because the persons he seeks to house (and profit from) are disabled, an outcome the law forbids. *Id.* (a zoning ordinance that raises the cost of housing hurts everyone who would prefer to pay less, and so need not be waived for the handicapped).

The district court's analysis is similar to the analysis and outcome in *Means*. There, the city granted a permit to operate a group home as long as off-street parking, adequate drainage, and a privacy fence were provided. Plaintiff alleged that the FHA

forbade imposition of those parameters. Granting summary judgment to the city, the court considered the conditions as part of the "necessary" analysis:

> The flaw in the Plaintiff's argument is that she has failed to present evidence which raises a genuine issue of material fact concerning the question of whether such an accommodation was necessary, in other words, that, because of the failure of the Defendant to dispense with the off-street parking requirement, mentally disabled adults have not been able to live with her. Although the failure to dispense with the off-street parking requirement has caused the Plaintiff to incur expenses to remove her garage and to erect a privacy fence, she has not presented evidence tending to demonstrate that her increased costs will prevent mentally disabled individuals from living with her.

*Means*, 111 F. Supp. 2d at 978; *see also Hemisphere Bldg.*, 171 F.3d at 440-41;

*Gavin v. Spring Ridge Conservancy, Inc.*, 934 F. Supp. 685, 687-88 (D. Md. 1995);

*Logan*, 57 F. Supp. 3d at 263-64.

Like the *Means*' requirement of parking and adequate drainage, there was no evidence the Provisions denied potential residents an equal opportunity to use and enjoy Banbury or diminished the therapeutic benefits the facility would have provided. *Supra* at 17-20. Though Lussi prefers an accommodation without those terms, "[m]erely being preferable to an alternative is not sufficient; it must be essential." *Harmony Haus*, 851 Fed. App'x at 465.

### 4. The Court Was Not Required to Assess Reasonableness.

Plaintiffs rely on *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1269 (11th Cir. 2019), to support their argument that the district court should have assessed the reasonableness of Plaintiffs' proposal before considering

Defendant's proposal. OB34-35. But that argument ignores that here, the basis for Defendant's motion was that Plaintiffs could not meet their burden to show that their requested accommodation was *necessary*. In *Schaw*, both the reasonableness and necessary elements were in dispute. In contrast, here the district court was considering whether Plaintiffs could meet their burden under *Bryant* to show that their requested accommodation was necessary. The court was permitted, and indeed required, to consider the alternatives to Plaintiffs' proposal, as it did here, and correctly determined that Plaintiffs' proposed accommodation was not necessary.

      C.     <u>The Government's Requested Change in the Law of this Circuit Should Be Rejected.</u>

As set forth above, the law of this Circuit puts the burden on Plaintiffs to prove all elements of their claim. Notwithstanding that precedent, the Government invites this Court to "squarely address[] the legal framework for assessing undue burden as part of the FHA's reasonableness prong." AB19. There is no compelling reason to do so. The district court's decision is amply supported by Plaintiffs' failure to meet the <u>refusal</u> and <u>necessary</u> elements of their claim, and therefore the reasonableness prong is of no significance.

Even if this Court wanted to reach the issue, the Government's standard is not necessary. The Government relies on *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002) and cases decided under it for the proposition that, to defeat summary judgment, Plaintiffs should only have needed to show that their preferred

accommodation was reasonable on its face, and then the burden would shift to defendant to prove that it is not. AB21-23; *see* OB34. According to them, Plaintiffs met their minimum burden, and the district court should have required Defendant to prove that Plaintiffs' requested accommodation was, in accordance with *Barnett*, an "undue burden."

*Barnett* was an employment case brought pursuant to the Americans with Disabilities Act (ADA), not the FHA. 535 U.S. at 394; AB22. Accordingly, the Court construed language in the ADA stating that the employer—or "covered entity"—has the burden to prove that the accommodation would impose "undue hardship" on the business. 535 U.S. at 394. Not surprisingly, the Supreme Court determined that this language created a shifting burden. *Barnett*, 535 U.S. at 402 ("[T]hat practical view of the statute … avoids Barnett's burden of proof dilemma, while reconciling the two statutory phrases ('reasonable accommodation' and 'undue hardship.')").

The phrase "undue hardship," however, is not present in the FHA, and the relevant language of the FHA does <u>not</u> state that the defendant has the burden to prove any component of FHA claims. Thus, as this Court already has held, "[b]ecause the FHA's text evidences no intent to alter normal burdens, the plaintiff bears the burden of proving each of these three elements by a preponderance of the evidence." *Bryant*, 124 F.3d at 603-04 (citing *Elderhaven*, 98 F.3d at 178). And

indeed, "the Supreme Court repeatedly has cautioned the courts not to shift the burden of persuasion absent a clear statement of congressional intent to deviate from the 'ordinary default rule that plaintiffs bear the risk of failing to prove their claims.'" *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 542-44 (6th Cir. 2014). The district court correctly held Plaintiffs to that burden.

In any event, here, the court's decision was not based on the reasonableness element at all; it was because Plaintiffs failed to show that Defendant had refused to provide an accommodation that was necessary to afford disabled persons an equal opportunity to enjoy housing. There just is no need to consider here whether *Barnett* might apply in some cases. Even if there was, the reasoning of *Hollis* is fully applicable as to why this Court should continue to hold a plaintiff to its burden in FHA claims. 760 F.3d at 542-44.

## II. Plaintiffs' Reasonable Accommodation Claim Fails Under State Law.

Plaintiffs' arguments fare no better under state law than they do under federal law. First, Plaintiffs do not dispute that Maryland state law "largely mirrors" the FHA. *Bd. of Dirs. Cameron Grove Condo., II v. State Comm'n on Human Rels.*, 63 A.3d 1064, 1072-73 (Md. 2013) (provisions are "nearly identical"). The only difference they point to is who bears the burden of showing a requested accommodation is *reasonable*. But that is not in dispute on this appeal. GIC argued for summary judgment based on Plaintiffs' failure to show that GIC refused an

accommodation, and that the accommodation was necessary. Plaintiffs do not dispute that, as to the necessary element, the burden is on the plaintiff (indeed they barely address necessity at all). The cases they cite *support* that the burden remains on them—and they failed to sustain it. *Id.* at 1075 n.13 (citing *Lapid-Laurel*, 284 F.3d at 459).

## III.    GIC Did Not Engage in Unlawful Discrimination or Retaliation.

Plaintiffs also appeal dismissal of their claims under 42 U.S.C. §3604(f)(1)-(2) and Md. Code, State Gov't §20-706(b)(1)-(2) for discrimination and claims under 42 U.S.C. §3617 and Md. Code, State Gov't §20-708 for retaliation.

As to Plaintiffs' federal and state law discrimination claims, the district court found "[t]he undisputed material facts show … there is no evidence before the Court [] that GIC intentionally discriminated against Plaintiffs, or their potential disabled residents, upon the basis of disability." ECF110 at 24. The district court also found Plaintiffs failed to state a claim under §3604(f)(2) because "there is no evidence before the Court [] that GIC took any actions related to the sale[] or rental of the Banbury Property," as required by the plain language of the statute. *Id.* at 24-25.[14] As for Plaintiffs' retaliation claims, the district court found, as a threshold matter,

---

[14] Plaintiffs do not develop any argument challenging this finding and have therefore waived it on appeal. *Grayson O Co.*, 856 F.3d at 316. Accordingly, GIC omits any argument relating to §3604(f)(2) but, in an abundance of caution, incorporates by reference its summary judgment arguments and the district court's findings. ECF71-1 at 36-39; ECF89 at 17-18; ECF110 at 24-25.

"to the extent that Plaintiffs seek to assert FHA retaliation claims based upon alleged retaliation against the Lussis, they lack standing to do so because the Lussis are not parties to this case." *Id.* at 26. Moreover, the district court found Plaintiffs could not show they suffered any "adverse action." *Id.*

Plaintiffs' arguments before this Court fail to rebut or often even address the sound findings and decisions of the district court. Accordingly, this Court should affirm.

A. There Is No Evidence GIC Engaged in Unlawful Discrimination Under the FHA.

To prove a claim of disability discrimination under §3604(f) of the FHA, Plaintiffs must furnish either direct evidence of discriminatory intent or proceed under the *McDonnell Douglas* burden-shifting framework. *Martin v. Brondum*, 535 Fed. App'x 242, 244 (4th Cir. 2013).

On appeal, though they make passing reference to the *McDonnell Douglas* framework, Plaintiffs fail to develop any corresponding argument and therefore have abandoned this theory. *Grayson O*, 856 F.3d at 316; *see also Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 383 n. 3 (4th Cir. 2018) (a "passing reference is insufficient to preserve [an] issue for [the Court's] review" where a party "fails to

include reasons and citations as required by our rules") (citing Fed. R. App. P. 28(a)(8)(A)).

Instead, Plaintiffs urge the Court to reverse on the basis that there is "direct evidence that as to the Banbury House proposal, just as with the Lussis' prior group-home efforts, [] the Corporation's goal was to *block* fair-housing rights." OB54. This position does not withstand scrutiny.

### 1. There Is No Direct Evidence of Discrimination.

Direct evidence is conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested decision. *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013). Statements may constitute direct evidence of discrimination, but only if they were "derogatory," "were related to the alleged discriminatory decision[,] … [and] were not stray or isolated," *Proa v. NRT Mid Atlantic, Inc.*, 618 F. Supp. 2d 447, 467 (D. Md. 2009) (citation omitted). Any such statements or actions must be "made by an actual decisionmaker." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 314 F.3d 657, 666, 673 (4th Cir. 2003), *aff'd on reh'g*, 354 F.3d 277 (4th Cir. 2004).

This definition is at odds with the evidence Plaintiffs present to the Court, all of which necessarily requires inferences to find any discriminatory motive. Plaintiffs admit as much. OB57 ("The evidence *and inferences* … show a continuous sequence of discriminatory and retaliatory intent.") (emphasis added). Plaintiffs primarily

point to two emails from former GIC President, James Daly. In the first—a response to a resident becoming aware that Banbury was transferred "to Group Home on Gibson Island, LLC, *which is related to Lussi*"—Daly wrote, "We'll do our best to defend deeds and agreement v FHA." OB54. The second email from Daly simply stated, "[W]e are taking a 360 degree look at how to block [*Craig Lussi*], even if the group home is 'by right' consistent with FHA." *Id.* The context of these communications is important: Daly made these statements in March and April 2020, after GIC learned of Lussi's defiance of the Deed Covenants and *before* Plaintiffs' June 2020 accommodation request. *See supra* at 6-7, 10. These statements pertained to Lussi's effort to establish Banbury without first seeking Corporation approval— *not* to Plaintiffs' subsequent request for an accommodation. Accordingly, these statements did not "bear directly on the contested decision," as is required. *Laing*, 703 F.3d at 717.

Moreover, neither statement "reflects directly" the disabilities of Banbury's potential residents. Neither statement on its face betrays any animus toward disabled individuals—one would have to infer discriminatory intent. Rather, both statements reflect awareness of the law and, specifically, an intent to stop Lussi's rule-breaking and enforce the Deed Covenants consistent with the FHA. *See, e.g.*, *Bondurant v. Air Line Pilots Ass'n, Int'l*, 679 F.3d 386, 395 (6th Cir. 2012) (statements evidencing awareness of ADEA law were not direct evidence of discrimination); *Gorny v.*

46

*Salazar*, 413 Fed. App'x 103, 108 (10th Cir. 2011) (statement that supervisor needed to implement a standard work schedule so it did not "look like he was singling out" plaintiff was not direct evidence). Plaintiffs point to nothing by an actual decisionmaker—including Daly's two statements noted above. Daly was not on the Board when Plaintiffs were negotiating with GIC in 2021, nor did he play any role in the negotiations or decisions surrounding approval of a reasonable accommodation. ECF88-3 at 27:6-13.

Plaintiffs' arguments that the Provisions are discriminatory fare no better. Nothing on the face of those Provisions or in the record of their development "directly reflects" discriminatory animus. The uncontradicted evidence is that they were to safeguard the Island's sensitive environment due to Banbury's proposed increased occupancy and to preserve GIC's financial and legal interests while disincentivizing Plaintiffs' combative principal from expensive, frivolous disputes. ECF89 at 8-9.

### 2. *The Community Views Argument Fails*.

Plaintiffs vaguely allude to statements, actions, and sentiments of non-decision-making "Corporation[] shareholders" and community members. OB55. Citing cases like *A Helping Hand* and *Yonkers Board of Education*, Plaintiffs urge this Court to hold that GIC can be liable for such statements, acts, and sentiments. *Id.*

Not so. These cases do not stand for the oversimplistic proposition that community views are automatically imputed to an organization or government; rather, they hold that "community views *may* be attributed to government bodies *when the government acts in response to these views.*" *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 365-66 (4th Cir. 2008) (emphasis added). In those cases, unlike here, there was direct or "undisputed evidence" the defendant organization acted *because of* its constituents' *discriminatory animus*. *Id.* (finding "abundant uncontroverted evidence that the County Council knew of and legislated in response to community opposition to the Clinic" where the County held an open work session and then immediately voted to adopt the at-issue legislation); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1234 (2d Cir. 1987) ("[n]early all of the councilmen [] stated explicitly that their constituents opposed minority housing," "there was evidence on several occasions [that] City officials sought to have white areas moved into school attendance zones that had a greater predominance of white students," and "[t]he City has offered no other explanation for the requests" other than "to increase the degree of school segregation").[15]

---

[15] The HUD-DOJ Joint Statement Plaintiffs cite specifically notes "[n]ot all community opposition to requests by group homes is necessarily discriminatory" and instead requires a defendant to take discriminatory action "*because of* neighbors' stereotypical fears or prejudices." *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act*, Joint Statement of the Dep't of HUD & DOJ 14 (Nov. 10, 2016) (emphasis added).

Here, Plaintiffs' "evidence" is not direct or undisputed that GIC acted because of community members' discriminatory animus. Aside from the unsupported allegation that "shareholders" were "expressing discriminatory views against individuals with disabilities," OB55, the only specific evidence that reflects discriminatory opposition were isolated statements made by two Club members (not affiliated with GIC). *Id.* at 6-7.

Again, context is important. These statements were made in 2018 in opposition to a proposed group home on Mountain Road—a property located outside of Gibson Island and not affiliated with GIC. Plaintiffs do not, and cannot, connect these isolated remarks to any decision-making about Banbury. Rather, months after the cited statements, GIC (1) chose to negotiate with Plaintiffs, (2) offered Plaintiffs multiple accommodations, and (3) made a final decision approving Banbury. This course of events demonstrates the "community" statements Plaintiffs cite are not direct evidence of discrimination by GIC. *See, e.g.*, *Meraki Recovery Hous., LLC v. City of Coon Rapids*, No. 20-cv-0203, 2021 WL 5567898, at *6-7 (D. Minn. Nov. 29, 2021) (collecting cases).

Because Plaintiffs offer no direct evidence of discriminatory motive from any decisionmaker or that GIC acted *because of* any community member discriminatory animus, Plaintiffs' federal discrimination claim fails.

### B. Plaintiffs' State Law Discrimination Claim Likewise Fails.

For the same reasons, Plaintiffs' state law discrimination claim also fails. *Bd. of Dirs. Cameron Grove Condo.*, 63 A.3d at 1072-73 (Maryland and federal provisions are "nearly identical"). Plaintiffs attempt to salvage this claim by pointing to employment cases where courts have applied a "motivating factor" standard for causation, not the "but for" test. OB52-53 (citing *Romeka v. RadAmerica II, LLC*, 301 A.3d 26, 39 (Md. 2023); *Ruffin Hotel Corp. of Md. v. Gasper*, 17 A.3d 676, 687 (Md. 2011)). This argument fails for several reasons.

First, Plaintiffs did not preserve this argument. Nowhere in their summary judgment briefing did Plaintiffs argue their state claim was subject to a different causation analysis. Instead, Plaintiffs' briefing acknowledged that Maryland state law is virtually identical to the federal statute. ECF85-1 at 9 n.1. Therefore, Plaintiffs have waived this argument on appeal. *Wilson v. Dryvit Sys.*, 71 Fed. App'x 960, 962 (4th Cir. 2003).

Even if Plaintiffs had not waived the issue, the argument ignores that Plaintiffs still must prove their discrimination claims through direct evidence or under the *McDonnell Douglas* burden-shifting framework. Plaintiffs do not dispute that this standard applies equally to their state law claim. As explained above, they fail to sustain this burden. Thus, the Court need not reach the causation issue.

Even if the Court were to reach the issue, the argument still fails. Neither case Plaintiffs cite stands for the proposition that in a *fair housing case* one motivation, among other legitimate motivations, can constitute discrimination. In Maryland, "[d]isbelief of a defendant's reasons is not enough to find intentional discrimination. A defendant's reasons cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Hanson-Metayer v. Rach*, Nos. 737 & 1657, 2018 WL 5045773, at *9 (Md. Ct. Spec. App. Oct. 17, 2018) (alteration in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). Plaintiffs' disbelief is not sufficient.

C.  Plaintiffs Do Not Have Standing to Bring Their Retaliation Claims, Nor Do They Have Sufficient Evidence to Sustain Those Claims.

While difficult to parse from the evidence purportedly supporting their discrimination claims, Plaintiffs appear to present a handful of alleged instances of "retaliation" by GIC, such as "removing the compacted gravel" and "stoking public retribution against Mr. Lussi." OB58. All of this evidence was before the district court, which found there was no retaliation under state or federal law because (1) Plaintiffs lacked standing and (2) there was no "adverse action." ECF110 at 25-27. This Court should find the same.

Plaintiffs do not allege any material difference between 42 U.S.C. §3617 and Md. Code State Gov't §20-708. Both statutes make it "unlawful to coerce, intimidate, threaten, or interfere with any person" in the exercise of any right granted

by fair housing laws. To establish coercion, intimidation, threats or interference, a plaintiff must prove: "(1) [they were] engaged in a protected activity; (2) the defendant was aware of that activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action." *Hall v. Greystar Mgmt. Servs., L.P.*, 28 F. Supp. 3d 490, 495 (D. Md. 2014) (citation omitted).

As a threshold matter, Plaintiffs' claim fails for lack of standing. In their complaint, discovery, and summary judgment briefing, Plaintiffs—two companies—did not allege GIC harmed *them* in retaliation for exercising fair housing rights. They alleged only that GIC falsely portrayed Lussi, a non-party. Plaintiffs do not have standing to allege that another person or entity was falsely portrayed or defamed in violation of §3617. *See Norman v. Borison*, 994 A.2d 1019, 1029 & n.11 (Md. Ct. Spec. App. 2010). It was on this basis that the district court dismissed Plaintiffs' retaliation claim, a ruling Plaintiffs fail to challenge in this appeal. *Grayson O*, 856 F.3d at 316 (finding waiver).

Even if Plaintiffs had standing, there has been no "adverse action." An "adverse action" is one that could well "dissuad[e] a reasonable [person] from making or supporting a charge of discrimination." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)); *see also Geraci v. Union Square Condo. Ass'n*, 891 F.3d 274 (7th Cir. 2018). Therefore, "a plaintiff must demonstrate

either the use or threatened use of some type of force or duress—physical, economic, emotional—for the purpose of denying the plaintiff his housing rights." *Pate v. Tucker*, No. 06-cv-936, 2007 WL 9780573, at *6 (D. Md. Jan 11, 2007) (citation omitted); *see also Clark v. 100 Harborview Drive Council of Unit Owners*, No. 14-cv-3122, 2016 WL 1159198, at *10 (D. Md. Mar. 23, 2016).

As the district court correctly noted, "[w]hile Plaintiffs argue that GIC retaliated against them by sending anonymous harassing letters and threatening to block their view from Banbury House with a large net, they point to no evidence to support these allegations." ECF110 at 26. In this appeal, Plaintiffs still produced no evidence that netting—intended to keep errant golf balls out of Banbury's lawn—was ever installed, or to explain how removing a gravel road *GIC* owns is retaliation for Plaintiffs engaging in an FHA-protected activity.

Likewise, the false light portrayal and *ad hominem* campaign Plaintiffs allege do not qualify as "adverse action." These alleged acts do not entail the use or threatened use of force or duress, *Pate*, 2007 WL 9780573, at *6, and would not "dissuade a reasonable person from making or supporting a charge of discrimination," *Hall*, 28 F. Supp. 3d at 495. Plaintiffs do not challenge the application of this standard or these findings from the district court in their appeal, and thus they are waived. *Grayson O*, 856 F.3d at 316.

Even if they did, the Court need only look as far as Lussi's behavior in the face of GIC's purported "campaign" to see he has not at all been dissuaded. *See Williams v. Arora Hills Homeowners Ass'n*, No. 19-cv-3370, 2021 WL 2226199, at *12 (D. Md. June 2, 2021) ("[T]he fact that an [individual] continues to be undeterred in his or her pursuit of a remedy … may shed light as to whether the actions [of the defendant] are sufficiently material and adverse to be actionable.") (citations omitted). And, even if the defamation Plaintiffs generically allege qualified as "adverse action," Plaintiffs have never identified a specific false light or defamatory statement GIC made during or after Plaintiffs' attempt to open a group home at Banbury. Nor have Plaintiffs explained or proven the falsity of any such statement or identified any tangible harm to them (or Lussi). Without alleging or proving the key elements of defamation, Plaintiffs have no claim for retaliation based on a false light portrayal. *Xiangyuan Zhu v. Countrywide Realty Co.*, 165 F. Supp. 2d 1181, 1197 (D. Kan. 2001).

Nor do the assertions that Banbury has not yet opened, or that Plaintiffs have been damaged, constitute "adverse actions" under §3617 or the Maryland analogue.[16] These allegations implicate no coercion, intimidation, threats, or

---

[16] Plaintiffs advanced this theory for the first time in their omnibus opposition and reply in the district court. ECF85 at 55-56. They never advanced this theory in their Amended Complaint or in response to an interrogatory seeking all facts supporting their retaliation claim. ECF47¶12; ECF71-77 at Interrog. 9. They are

interference in response to Plaintiffs engaging in an FHA-protected activity. 42 U.S.C. §3617; Md. Code State Gov't §20-708. They do not give rise to a retaliation claim under §3617; they are simply allegations that rights under §3604(f) have been violated. *Hall*, 28 F. Supp. 3d at 495 (defining elements of §3617 claim). The district court properly considered them in the context of Plaintiffs' reasonable accommodation claims and found they could not support Plaintiffs' retaliation claim. This Court should, too.

---

therefore precluded from doing so now. *See, e.g.*, *Lambert v. Savaseniorcare Admin Servs., LLC*, No. 20-cv-2768, 2022 WL 3027993, at *20 n.6 (D. Md. July 29, 2022).

## CONCLUSION

For all of these reasons, Plaintiffs' claims fail, and the Court should affirm their dismissal.

Dated: April 18, 2024                    Respectfully submitted,

/s/ *Stacie E. Tobin*
Stacie E. Tobin
VENABLE LLP
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
Telephone: (410) 244-7400
Facsimile: (410) 244-7742
setobin@venable.com

Katherine Wright Morrone
VENABLE LLP
600 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
kwmorrone@venable.com

Craig D. Roswell
NILES BARTON AND WILMER LLP
111 S. Calvert Street, Suite 1400
Baltimore, Maryland 21202
Telephone: (410) 783-6300
cdroswell@nilesbarton.com

Counsel for Appellee Gibson Island Corporation

# Fed. R. App. P. 28(f) / Local R. 28(b) Addendum

# 42 U.S.C. § 3604. Discrimination in the sale or rental of housing and other prohibited practices

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

**(a)** To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

**(b)** To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

**(c)** To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

**(d)** To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

**(e)** For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin.

**(f)(1)** To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

> **(A)** that buyer or renter,

> **(B)** a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

> **(C)** any person associated with that buyer or renter.

**(2)** To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

**(A)** that person; or

**(B)** a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

**(C)** any person associated with that person.

**(3)** For purposes of this subsection, discrimination includes—

**(A)** a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted.

**(B)** a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; or

**(C)** in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1988, a failure to design and construct those dwellings in such a manner that—

**(i)** the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

**(ii)** all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

**(iii)** all premises within such dwellings contain the following features of adaptive design:

**(I)** an accessible route into and through the dwelling;

**(II)** light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

**(III)** reinforcements in bathroom walls to allow later installation of grab bars; and

**(IV)** usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

**(4)** Compliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as "ANSI A117.1") suffices to satisfy the requirements of paragraph (3)(C)(iii).

**(5)(A)** If a State or unit of general local government has incorporated into its laws the requirements set forth in paragraph (3)(C), compliance with such laws shall be deemed to satisfy the requirements of that paragraph.

**(B)** A State or unit of general local government may review and approve newly constructed covered multifamily dwellings for the purpose of making determinations as to whether the design and construction requirements of paragraph (3)(C) are met.

**(C)** The Secretary shall encourage, but may not require, States and units of local government to include in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, determinations as to whether the design and construction of such dwellings are consistent with paragraph (3)(C), and shall provide technical assistance to States and units of local government and other persons to implement the requirements of paragraph (3)(C).

**(D)** Nothing in this subchapter shall be construed to require the Secretary to review or approve the plans, designs or construction of all covered multifamily dwellings, to determine whether the design and construction of such dwellings are consistent with the requirements of paragraph 3(C).

**(6)(A)** Nothing in paragraph (5) shall be construed to affect the authority and responsibility of the Secretary or a State or local public agency certified pursuant to section 3610(f)(3) of this title to receive and process complaints or otherwise engage in enforcement activities under this subchapter.

**(B)** Determinations by a State or a unit of general local government under paragraphs (5)(A) and (B) shall not be conclusive in enforcement proceedings under this subchapter.

**(7)** As used in this subsection, the term "covered multifamily dwellings" means--

> **(A)** buildings consisting of 4 or more units if such buildings have one or more elevators; and

> **(B)** ground floor units in other buildings consisting of 4 or more units.

**(8)** Nothing in this subchapter shall be construed to invalidate or limit any law of a State or political subdivision of a State, or other jurisdiction in which this subchapter shall be effective, that requires dwellings to be designed and constructed in a manner that affords handicapped persons greater access than is required by this subchapter.

**(9)** Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

# 42 U.S.C. § 3617. Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, `or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

# Md. Code, State Gov't § 20-706. Discrimination against individuals with disabilities; accessibility

## Definitions

(a)(1) In this section the following words have the meanings indicated.

(2) "Covered multifamily dwelling" means:

(i) a building consisting of four or more units, if the building has one or more elevators; or

(ii) a ground floor unit in a building consisting of four or more units, if the building has no elevator.

(3)(i) "Service dog" means a dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability.

(ii) "Service dog" does not include a dog that:
1. as a result of the animal's presence, is meant to deter crime; or

2. provides only emotional support, well-being, comfort, or companionship to an individual.

## Discrimination against individuals with disabilities

(b) Except as provided in §§ 20-703 and 20-704 of this subtitle, a person may not:

(1) discriminate in the sale or rental of, or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a disability of:

(i) the buyer or renter; or

(ii) an individual residing in or intending to reside in the dwelling after it is sold, rented, or made available;

(2) discriminate against any individual in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with the dwelling, because of a disability of:

(i) the individual; or

(ii) an individual residing in or intending to reside in the dwelling after it is sold, rented, or made available;

(3) refuse to allow, at the expense of an individual with a disability, reasonable modifications of existing premises occupied or to be occupied by the individual, if:

(i) the modifications may be necessary to afford the individual with a disability full enjoyment of the dwelling; and

(ii) for a rental dwelling, the tenant agrees that, when the tenant vacates the dwelling, the tenant will restore, at the tenant's expense, the interior of the dwelling to the condition that existed before the modification, except for reasonable wear and tear;

(4) refuse to make reasonable accommodations in rules, policies, practices, or services when the accommodations may be necessary to afford an individual with a disability equal opportunity to use and enjoy a dwelling;

(5) fail to design or construct a covered multifamily dwelling for first occupancy as required under subsection (c) of this section; or

(6) discriminate in the sale or rental of, or otherwise make unavailable or deny, a dwelling to an individual with a disability who:
(i) has or obtains a service dog; or
(ii) retains the individual's former service dog after its retirement from service.

## Accessibility

(c)(1) On or after July 1, 1991, a covered multifamily dwelling for first occupancy shall be designed and constructed so that:

(i) the public use and common use portions of the dwelling are readily accessible and usable to individuals with disabilities;

(ii) all the doors designed to allow passage into and within all premises within the dwelling are sufficiently wide to allow passage by individuals with disabilities in wheelchairs; and

(iii) all premises within the dwelling contain the following features of adaptive design:

  1. an accessible route into and through the dwelling;

  2. light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

  3. reinforcements in bathroom walls to allow later installation of grab bars; and

  4. usable kitchens and bathrooms so that an individual in a wheelchair can maneuver about the space.

(2) The requirements of paragraph (1) of this subsection are satisfied by compliance with:

  (i) the appropriate requirements of the most current revision of the American National Standard for Buildings and Facilities Providing Accessibility and Usability for Physically Handicapped People (commonly cited as ANSI A117.1); or

  (ii) the federal law, regulations, and guidelines on handicapped accessibility adopted under the federal Fair Housing Amendments Act of 1988 and incorporated by reference in the regulations adopted by the Department of Housing and Community Development under § 12-202 of the Public Safety Article.

### Rights and responsibilities of individuals with a service dog

(d) An individual with a disability who has, obtains, or retains a service dog as provided in subsection (b)(6) of this section:

  (1) shall be exempt from any provision in a lease or rental agreement prohibiting the keeping of dogs;

(2) may not be required to pay any additional rent or fee for the individual's service dog or former service dog;

(3) may keep the individual's former service dog in the dwelling for the life of the service dog after its retirement from service; and

(4) shall be liable for any damage done to the premises by the individual's service dog or former service dog.

# Md. Code, State Gov't § 20-708. Interference with exercise of rights

A person may not coerce, intimidate, threaten, interfere with, or retaliate against any person:

> (1) in the exercise or enjoyment of any right granted or protected by this subtitle;

> (2) because a person has exercised or enjoyed any right granted or protected by this subtitle; or

> (3) because a person has aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by this subtitle.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 12,851 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point using Microsoft Word for Microsoft 365.

*/s/ Stacie E. Tobin*
Stacie E. Tobin

## CERTIFICATE OF SERVICE

I hereby certify that, on April 18, 2024, I filed this brief with the Court's

CM/ECF system, which will cause copies to be served on all counsel of record.

*/s/ Stacie E. Tobin*
Stacie E. Tobin
